Filed 2/4/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | S090602 |
| | ) | |
| Plaintiff and Respondent, | ) | Alameda County |
| | ) | Super. Ct. No. 135280 |
| v. | ) | |
| | ) | |
| LOUIS JAMES PEOPLES, | ) | |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

On August 4, 2000, defendant Louis James Peoples was sentenced to death for murdering James Loper, Stephen Chacko, Besun Yu, and Jun Gao. This appeal is automatic. We affirm the judgment.

## I. FACTS AND BACKGROUND

In an amended information filed on May 11, 1999, in San Joaquin County Superior Court, the district attorney charged defendant with four counts of first degree murder (Pen. Code, § 187; all further statutory references are to the Penal Code unless otherwise indicated), one count of attempted murder (§§ 664, 187), three counts of second degree robbery (§ 211), four counts of auto burglary (§ 459), and one count of receiving stolen property (§ 496, subd. (a)). The amended information alleged firearm use enhancements as to the murders, the attempted murder, and three of the four burglary counts (former §§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)) and the infliction of great bodily injury with respect to the attempted murder count (former § 12022.7, subd. (a)). Finally, the

amended information alleged multiple-murder, lying in wait, and robbery special circumstances. (§ 190.2, subd. (a)(3), (15), (17).)

The trial court dismissed two of the four counts of burglary. A jury convicted defendant of four counts of first degree murder, three counts of second degree robbery, two counts of burglary, and one count of receiving stolen property. The jury also found true the firearm use enhancement with respect to each of the murders and the multiple murder, lying in wait, and robbery special circumstance allegations. The jury could not reach a verdict on the attempted murder charge, and the trial court declared a mistrial as to that count and the related allegations.

The same jury heard evidence in defendant's first penalty phase trial but could not achieve unanimity on a penalty verdict. The trial court declared a mistrial. The trial court empaneled a second penalty jury, which ultimately returned a verdict of death. The trial court denied the automatic motion to modify the verdict and imposed the death sentence.

## A. Guilt Phase

Over the course of a five-month period from June to November 1997, defendant received stolen property and committed two burglaries, three robberies, and four murders.

### 1. Burglary of Michael King's van

On the morning of June 21, 1997, defendant broke into the van of off-duty Alameda County Deputy Sheriff Michael King while King and his family were watching his son play baseball at Anderson Park in Stockton. Upon returning to the van, King noticed the passenger side door was unlocked, and several items were missing, including his wife's purse, two checkbooks, and King's fanny pack, which in turn contained his fully loaded .40-caliber Glock service pistol, his

2

sheriff's deputy badge, and identification card. The King family's telephone number was on the stolen checkbooks. King filed a police report with Officer Michael Scofield of the Stockton Police Department.

On June 22, King contacted Scofield to report two phone calls the Kings received at home. In the second call, a male caller said, "Thank you for the fucking gun, you idiot," and hung up.

On November 13, one day after his arrest, defendant discussed the burglary of King's van in an interview with Dr. Kent Rogerson, a private practice psychiatrist retained by the prosecution to conduct a general psychiatric exam and assess defendant's competency. In addition, police found a "slim jim," which can be used to access locked vehicles, in defendant's apartment.

### 2. *Cal Spray shooting and burglary*

During the summer of 1994, defendant worked as a "miscellaneous man" at California Spray Dry Company (Cal Spray), which processes animal remains for dehydrated animal food and fertilizer products. He was later promoted to operator — a position that required him to closely monitor valve switches on dryer tanks. On several occasions, defendant failed to monitor the dryer valves, resulting in significant product damage. Defendant's coworkers also noted that he periodically displayed nervous and erratic behavior. Michael Liebelt, who trained defendant at Cal Spray, explained that defendant's erratic behavior and repeated mistakes resulted in his eventual dismissal. Defendant's supervisor at Cal Spray, Gregory Beal, testified at trial that defendant disagreed with his termination from Cal Spray and took it personally.

Three years later, around 3:30 a.m. on September 16, 1997, Cal Spray employee Thomas Harrison pulled into the Cal Spray plant's secure parking lot on the outskirts of Stockton for his morning shift. His coworker, Timothy Steele,

entered the lot around the same time. When Steele entered the lot, he noticed someone leaning into the open passenger side door of a blue pickup truck.

When Harrison and Steele exited their vehicles, they noticed that most of the lot's vehicles were vandalized, including the pickup truck of employee David Grimes. Harrison then approached the blue pickup truck to investigate. When Harrison was halfway to the truck, the man who had been leaning into the open door fired two gunshots at Harrison. Harrison later realized the man was defendant, his former coworker at Cal Spray. Harrison fell to the ground as defendant continued to shoot. Harrison felt pain in his right leg and pelvic bone, and cried out that he had been shot.

As defendant began to flee, running toward a hole in a nearby fence, he fired two shots at Steele. Steele heard one of the bullets sail by his head. Steele called 911 using Harrison's cell phone, and medical personnel arrived and transported Harrison to the hospital. Harrison sustained a bullet wound to his upper right leg and was hospitalized for nine days.

Evidence technicians recovered seven .40-caliber shell casings from the scene. Several vehicles in the parking lot had been vandalized. The police found a large pair of bolt cutters in one of the vandalized vehicles and discovered a two-foot-wide hole that appeared freshly cut in the fence surrounding the plant. Additionally, police found shoe prints left in dried blood on the lot.

A few hours before the shooting, Beal had received a phone call. Although Beal's home phone number was unlisted, employees had access to the number. The male caller addressed Beal by his first name and reported a fire in one of the plant's dryers. Beal did not recognize the voice but believed the caller knew the plant's procedures. Beal rushed to the plant but found no fire.

The next day, between 2:30 and 3:30 a.m., Cal Spray shift supervisor Michael Liebelt also received a phone call. The caller asked if "anybody had been

4

shot out there . . . , if anybody had died out there. . . ." When Liebelt demanded that the caller identify himself, the caller asked whether "anyone had gotten wasted out there last night?" The caller then giggled and hung up.

### 3. *Bank of the West robbery*

Sometime between 3:30 and 4:30 p.m. on October 24, 1997, defendant walked into a Bank of the West branch in Stockton and handed bank teller Jason Tunquist a note that demanded money and threatened the use of a gun. Defendant pulled out his gun, cocked it, and aimed it at Tunquist. Tunquist gave defendant a stack of bills totaling $900, and defendant fled the bank.

Tunquist described the assailant to police as male, about five feet seven inches in height and 150 pounds, 45 or 50 years old, with a "weathered look." Although he was unable to identify the robber from a police photo lineup, Tunquist later identified defendant as the robber about a month later when he saw defendant's photo in the newspaper.

### 4. *Murder of James Loper*

Defendant began working as a tow truck driver at Charter Way Tow in June 1997. He was suspended on October 6, 1997, for 30 days after testing positive for methamphetamine during a routine drug test. One of the owners of Charter Way Tow, Rodney Dove, reported that defendant was upset when he was suspended.

Around 2:50 a.m. on October 29, 1997, Charter Way Tow telephone operator Mary Kuwabara received a call requesting a tow from a man who identified himself as "Jason Lee." The caller said he was on Eight Mile Road, west of Interstate 5. Kuwabara dispatched Loper to the call because he was second on the list of three on-call drivers, and the first driver had been dispatched to an earlier call. The earlier caller had identified himself as "Doug Stone" and requested a slide-back tow truck; Loper was the only driver on duty that did not

5

have a slide-back truck. The caller's location was on the opposite end of Stockton from the Eight Mile Road location.

Around 3:45 a.m. that same morning, San Joaquin County Deputy Sheriffs Kenneth Bassett and Bill Gardner were on routine patrol traveling west on Eight Mile Road in a rural area near Stockton. After stopping to investigate an unoccupied tow truck parked on the side of the road with its lights on and engine running, Gardner saw the body of James Loper lying underneath the truck. Loper was unresponsive, and the deputies called for an ambulance.

On the driver's side of the truck, Bassett found nine spent gun cartridges, which were later determined to be .40-caliber casings. Based on the position of the cartridges, Basset believed the shooter fired multiple times at Loper after Loper climbed under the truck. The deputies called for medical personnel and backup from police detectives. Medical personnel arrived and removed Loper from under the truck. San Joaquin County Sheriff's Detectives Antonio Cruz and John Huber responded to the scene and took over the investigation. Investigators recovered physical evidence from the scene, including boot prints later determined to be from Ariat brand boots.

Loper's autopsy revealed 10 gunshot wounds, all of which were sustained while he was alive. At trial, forensic pathologist Dr. Sally Fitterer testified that gunshot wounds to Loper's abdomen caused his death.

The day after the murder, defendant called Charter Way Tow and spoke with Sandi Dove. Defendant said Loper was a "good guy" and told Dove he was sorry about Loper's death. Defendant also asked if the company wanted him to come back from suspension before the end of his 30-day suspension because they were shorthanded. Dove declined and told defendant that he had to serve out his suspension.

## 5. *Murder of Stephen Chacko and robbery of Mayfair Liquors*

Shortly after 7:30 a.m. on November 4, 1997, Stockton police Officer Ernest Alverson responded to a report of shots fired at the Mayfair Liquors store in Stockton. Upon arrival, Alverson saw a man, later identified as Stephen Chacko, bleeding and lying lifeless in the parking lot of the store. Alverson and his partner, Officer Bowen, went inside the store and were later joined by Detective Jeff Coon. Police found blood, broken items, and .40-caliber shell cartridges inside the store. A trail of blood from one of the store aisles led out into the parking lot, where additional spent .40-caliber cartridges were found.

At the scene, investigators recovered 19 bullet fragments, 14 shell casings, and one live round. Investigators also recovered video footage from a security camera inside the store, which was shown to the jury, that placed the time of the robbery and murder at around 7:20 a.m. The footage, though not very clear, shows Chacko standing in the main aisle of the store, between the cash register and the other aisles, and defendant in one of the aisles with his arm extended. Later, defendant is seen standing behind the open drawer of the register, then moving to the left and slightly extending his right arm.

The autopsy of Chacko revealed five gunshot wounds. A gunshot wound below Chacko's armpit was fatal.

Based on the shell casings and the weapon used in the shooting, Detective Coon believed that the Mayfair Liquors murder and the Eight Mile Road murder were connected. In addition, the subject in the security video resembled the subject in the Bank of the West video.

## 6. *Murders of Besun Yu and Jun Gao and robbery of Village Oaks Market*

Around 9:55 a.m. on November 11, 1997, San Joaquin County Deputy Sheriff Charles Locke responded to a report of gunshots fired with two individuals

injured at the Village Oaks Market in Stockton. Locke entered the store and found Besun Yu in a crouched position behind the cash register. She was unresponsive and had a weak pulse. Locke administered CPR. An autopsy later revealed that Yu sustained three gunshot wounds, including the fatal shot that severed her spinal cord.

Locke also saw the body of Jun Gao, lying facedown with a pool of blood near his head. An autopsy later revealed that Gao sustained a single gunshot wound that perforated his left jugular vein and carotid artery.

Locke observed .40-caliber shell casings near the cash register, and it appeared that another register had been forcibly removed. The safe in the store's office was unlocked, and inside were rolls of coins. Evidence technicians recovered five shell casings, four bullets, and two bullet fragments from the scene. Forensic firearms expert Michael Giusto opined that the shell casings recovered at the scene were most likely fired from a Glock pistol. The missing cash register was recovered hours later on Highway 99 in Stockton. The cash register drawer was also found that evening on the outskirts of Stockton. Detective Coon received information about a vehicle possibly associated with the crime — a 1990s, four-door, dark-gray Nissan Stanza, with primer or oxidation marks.

### 7. *Investigation and apprehension*

Around 1:00 p.m. on November 12, 1997, Stockton police Officer Brian Swanson saw a vehicle that matched the description of the suspect vehicle in the Village Oak Market murders in the parking lot of an apartment complex near the crime scene. The car was registered to Carol Peoples. Her husband, Louis James Peoples, was listed as a possible owner. The apartment complex was one block from Anderson Park and Mayfair Liquors, less than one mile from the Bank of the West, two miles from the Village Oaks Market, and seven miles from the Eight

8

Mile Road murder scene. Detective Coon recognized defendant's name as a person who had been terminated from Charter Way Tow, and he told officers to detain anyone that got in the car. Aided by a photo of defendant, officers saw a white male matching his description leaving the complex and arrested him at 3:15 p.m.

At the time of his arrest, defendant was carrying a backpack that contained a black nylon jacket, green knit gloves with silver duct tape on the fingers and backs, a black baseball hat, a California license plate, an Oregon driver's license in the name of Nathan Gelder, the checkbooks in Michael and Eva King's names, a police scanner, and a radio call book containing radio frequencies for police and fire personnel. Additionally, the backpack contained a blue folder with the handwritten words "Biography of a Crime Spree." The folder contained newspaper clippings about the crimes and a note that read, "Some of the inserts in this scrapbook were merely for the motive of revenge, some was to support my family when I was unemployed. Some of them started out to be one thing and turned into something a little more extreme. I have to admit I've always wanted to murder someone, and the idea of a crime spree has appealed to me for some time now, hence, the crime spree. I guess we will see where it goes. (I never thought the two people in the Village Oaks store would die, after all, I only shot them two times each. Ha! Ha!)"

Defendant was also wearing a fanny pack that contained a small pair of binoculars, a Swiss Army-type knife, a mini MagLite flashlight, a buck-type knife in a holster with defendant's initials, handcuffs, pepper spray, a Social Security card in the name of Justin Werner, a nylon gun holster, and Michael King's sheriff's deputy badge and identification. It appeared defendant had changed the photo on King's identification to his own.

9

Officer Swanson did not observe defendant to be intoxicated or exhibiting obvious signs of drug use at the time of the arrest. Defendant did not exhibit any unusual behavior during the 10-minute drive to the police station.

Police searched defendant's apartment that night after obtaining a search warrant. Police found the following items: a pair of Ariat brand boots with a print pattern similar to that found at the Eight Mile Road murder scene; a map of Stockton with marked locations, including Mayfair Liquors and Village Oaks Market; a "slim jim"; and a note that read, "CWT Charter Way Tow. Can I help you? Dude, yeah, check this out. You and the popos are all fucked up about Jimbo. He was a punk. He was on dope like the rest of your Charter Way drivers. Jimbo didn't want to pay. That's why he got capped. He wasn't the goodie goodie everybody thought he was. So get it straight."

Beginning around 4:30 p.m. on the day of the arrest, Detective Huber and Detective Coon advised defendant of his *Miranda* rights and interviewed him without his lawyer present. (See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) The interview lasted approximately 12 hours, ending around 4:30 a.m. on November 13, 1997. According to Huber, defendant did not appear under the influence of drugs at the time of the interview; however, he appeared sleepy and may have been experiencing symptoms of withdrawal.

Defendant denied involvement in the crimes during the first nine or 10 hours of the videotaped interview. During the last hour, he confessed to the homicides and other crimes, and drew a diagram indicating the location of the murder weapon. Officers were initially unable to locate the murder weapon. Later that morning defendant accompanied two detectives to the location. Officers recovered a gray plastic bag in a vacant lot about three blocks from defendant's apartment that contained a black leather pouch and a box of .40-caliber hollow-point bullets. The pouch contained a handgun that had been altered — the serial

10

number was destroyed and the breech face sanded down — but was later identified as the .40-caliber Glock pistol defendant stole from Deputy King's vehicle on June 21. The pouch also contained one rubber glove, an off-white piece of paper, and six white envelopes, including one containing a note that read, "Give me all the 100's, 50's, 20's and 10's. Make it fast, and nobody will get shot."

After recovering the .40-caliber handgun, the prosecution's firearms expert Michael Guisto test-fired the pistol and determined that all cartridges collected in the case investigation were fired from the same gun. Furthermore, Guisto noted that the difference in breech marks on the cartridges recovered from the Eight Mile Road murder scene and the Mayfair Liquors murder scene suggested a possible alteration of the gun between the shootings. Such alteration could be accomplished using sandpaper. In a videotaped interview on November 14, defendant admitted to Detective Huber that he had sanded the gun down.

### 8. Defense Expert Testimony

During the guilt phase, defendant presented the testimony of three expert witnesses: Drs. Joseph Chong-Sang Wu, Daniel Amen, and Monte Buchsbaum. Dr. Wu testified that he had performed a positron emission tomography (PET) brain scan on defendant, from which he had concluded that defendant's brain was "clearly abnormal" with respect to the degree of activity in his frontal lobe, evincing brain damage related to the impairment of high-level functioning and the regulation of aggressive impulses. Dr. Wu could not say with certainty the cause of these abnormalities, but that they were consistent with methamphetamine abuse. Dr. Amen testified that he had performed multiple single-photon-emission computed tomography (SPECT) brain scans on defendant, from which he had concluded that defendant's brain was abnormal in a manner consistent with methamphetamine abuse or head trauma, and that the scans showed reduced brain activity in executive functioning areas and high activity in the cingulate gyrus, the

11

latter of which is consistent with the presence of compulsive, repetitive thoughts. Finally, Dr. Buchsbaum testified on the basis of Drs. Wu's and Amen's scans that defendant had a defect in his frontal lobe consistent with methamphetamine abuse, head trauma, or a combination of the two, that could cause a lack of impulse control. In his closing argument, defense counsel argued that these brain abnormalities called into question defendant's ability to "control his thoughts, feelings, or behavior," and therefore to form the specific intent necessary for a conviction of first degree murder and robbery.

### B. Penalty Phase

The first penalty phase jury was unable to reach a unanimous verdict. After the first penalty-phase trial ended in a mistrial, a second jury was empaneled and ultimately sentenced defendant to death. The following evidence was presented to the second penalty phase jury.

#### 1. Prosecution evidence

#### a. Circumstances of the crime

The prosecution presented many of the same witnesses and evidence during the penalty retrial that were presented during the guilt phase and first penalty trial.

#### b. Victim impact evidence

The victims' family members testified about the lives of the victims and the effect of their murders.

James Loper was married to his high school sweetheart and was the father of two boys, ages six and eight. His wife testified that Loper's murder had "torn [the family] apart," and subsequently, their older son began experiencing problems in school. His mother Hazel testified that Loper loved his family and worked very hard to provide for them. Hazel also testified that Loper's father was

12

"not doing well" since the murder and could not testify for fear that he could not control himself in defendant's presence.

Stephen Chacko's wife, Anice, testified that Chacko had moved to the United States from India to be with Anice and together they owned Mayfair Liquors. The couple had two children, and Anice was pregnant with their third child at the time of Chacko's murder. Anice testified that Chacko was a loving family man who worked hard to support the family. After Chacko's murder, Anice had to move to India to live with Chacko's family because she and the children were homeless. Anice testified that the children missed their father and did not understand why he was gone.

The prosecution was unable to present victim impact evidence regarding the murder of Jun Gao because he did not have family in the United States. He had recently emigrated from China to help his friend Besun Yu run the Village Oaks Market.

Besun Yu was a married mother of three, who was described by her children as sweet, kind, loving, and hard-working. Yu's son Jack testified that since her murder, the family had drifted apart because Yu was the "pillar that [held] everything together." Yu's husband was unable to testify and was "not himself" since her murder. Yu's son David testified that the aftermath of her murder was "very hard" on the family. Yu's daughter Karen testified that defendant had "ruined [her] whole family."

### c. Prior convictions

The prosecution introduced into evidence defendant's certified prior convictions for felony burglary in Florida from 1982.

## 2. *Defense evidence*

### a. *Testimony of defendant's family and friends*

The defense presented testimony from defendant's mother, Loretta Peoples, who described defendant as a loving father and husband. She detailed defendant's rough upbringing and described his father Luther as a verbally abusive alcoholic. Defendant had a history of bedwetting that continued into his teenage years. On one occasion, he soiled his pants and was publicly humiliated and degraded by his mother. When defendant was a teenager, his mother relinquished parental control to the sheriff, and defendant became a ward of the court. He was assigned a juvenile court counselor who was later convicted of molesting children. According to Dr. Gretchen White, defendant confided in her that he had been molested by the counselor on at least two occasions.

Defendant's father Luther testified that Loretta was worried about defendant during his teen years because of his drug use and problems with the law, including a stint in a juvenile correctional facility for 18 months during high school. Defendant's older brother Larry described defendant as sensitive, quiet, and passive. Larry could not recall a history of violence but did note defendant's history of drug use.

Defendant's 15-year-old stepson and nine-year-old daughter testified that defendant was a loving father. Defendant's wife Carol testified that the couple started using drugs, including methamphetamine, from the beginning of their relationship in 1988. Carol described defendant as a loving family man and good father. Carol also reported that defendant was never violent toward her during the nine years they lived together.

Defendant's neighbors testified that he was a good father and had never been violent. In addition, a minister who conducted prisoner outreach testified on

14

defendant's behalf. It was only the third time since he started his prison ministry in 1953 that the minister had testified on an inmate's behalf.

### b. Expert testimony

The defense offered expert testimony from Dr. Wu and Dr. Amen regarding the results of PET and SPECT brain scans they had performed on defendant. Dr. Amen opined that the SPECT scans showed a functionally damaged brain that affected defendant's thought process. Defendant's methamphetamine use exacerbated his condition. Dr. Wu testified that he was 95 percent certain that defendant's brain was abnormal based on his PET scan. Additionally, there was a greater than 95 percent probability that a methamphetamine user would have an abnormal brain scan.

Dr. George Woods, a psychiatrist, opined that defendant's violent acts were attributable to methamphetamine impairment, which caused him to misperceive reality and led to paranoid ideations and aggressions. Since being in jail and off drugs, defendant had gained an appreciation of the harm of his actions. Dr. Woods believed defendant was truly remorseful.

Dr. David Lisak, a clinical psychologist, testified about the psychological and emotional effects that a traumatic sexual experience can have on an adolescent boy.

### c. Correctional officers' testimony

San Joaquin County Sheriff's Deputies who had contact with defendant in their capacity as correctional officers testified that defendant was calm, quiet, and respectful while in their custody. None of the officers reported instances where defendant resisted their commands or failed to obey orders. By all accounts, he was a model prisoner.

15

### 3. Prosecution rebuttal evidence

Dr. Helen Mayberg, a clinical neurologist, criticized the defense experts' opinions that defendant's brain scans revealed serious abnormalities. Instead, Dr. Mayberg opined that if the scans demonstrated any neurobiological condition, it was possibly depression. Because defendant's crimes required "tremendous deliberation, planning, forethought, decision-making, execution, [and] follow-through," Mayberg said, his conduct was not attributable to brain damage, intoxication, or other drug-related issues.

Dr. Kent Rogerson, a psychiatrist for the prosecution, diagnosed defendant with methamphetamine dependency and an antisocial personality disorder with schizoid traits. Dr. Rogerson opined that defendant's crimes were not impulsive; they were goal-directed conduct. Although defendant's methamphetamine abuse seriously affected his life, his writings and reaction to his crimes indicated that he was capable of making conscious decisions to harm people.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Admission of involuntary statement to the police

Defendant claims that the trial court erroneously admitted his involuntary statement to the police in violation of his state and federal constitutional rights against self-incrimination, against cruel and unusual punishment, to a fair trial, to due process, and to a reliable determination of guilt and punishment.

#### a. Background

Following defendant's arrest on November 12, 1997, Detectives Huber and Coon interrogated him in videotaped sessions from approximately 4:00 p.m. on November 12 to approximately 4:45 a.m. on November 13. The detectives advised defendant of his *Miranda* rights. Over the course of the interrogation, defendant showed signs of physical and mental exhaustion: sweating, pulling out

16

his hair, rubbing his skin, twitching his facial muscles, grinding his teeth, and at times appearing to fall asleep. He was provided with bathroom breaks, coffee, waters, sodas, and pizza. Detectives also asked defendant if he wanted to speak with a lawyer.

The detectives questioned defendant constantly for the first 10 hours of the interview, during which he denied any knowledge of the crimes. Detectives suggested to defendant that aspects of his story were contradicted by information they already knew, and they attempted to secure his trust by offering various charitable reconstructions of his crimes, such as "you didn't mean to [shoot anyone]." Toward the end of the interrogation, the police confronted him with his wife's statements made to police after his arrest and threatened to "drag" her into the case and "lean on" his stepson. They also showed pictures of his family to defendant and pleaded with him not to make his family's life any more difficult than he already had. Defendant eventually agreed to show police where he had left the murder weapon.

On October 13, 1998, defendant filed a motion to suppress his statements to police given on November 12 and 13, 1997. The prosecutor filed an opposition on October 26, 1998. Defendant filed a reply that included a motion to redact any inadmissible portions of the statements under Evidence Code section 352 if the trial court denied the motion to suppress.

Dr. Richard Leo, a professor in the Department of Criminology at University of California, Irvine, testified about the tactics used by police in securing defendant's confession. He opined that the detectives used coercive techniques to undermine defendant's free will over 50 times during the 12-hour interrogation. Specifically, Dr. Leo characterized the police's threats to involve defendant's wife and stepson in the interrogation as "classic" and "high-end"

17

coercive techniques.  Dr. Leo acknowledged that as a social scientist, he may define "coercion" differently than the law does.

The trial court noted that the 12-hour interview was "a very lengthy interrogation."  However, the trial court determined, based on the totality of circumstances, that defendant's statements were not elicited by "undue coercion."  The trial court denied both of defendant's motions and admitted the videotaped confession into evidence.  The tapes were played during the guilt phase of the trial.

### b.  Analysis

"The Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution make 'inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion.' " (*People v. Sapp* (2003) 31 Cal.4th 240, 267.)  The prosecution must prove by a preponderance of the evidence that a defendant freely and voluntarily gave police statements before the statements can be admitted.  (*Ibid*.)  " 'Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the "totality of [the] circumstances." ' " (*Ibid*.)  The test considers several factors, including any element of police coercion, the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health.  (*People v. Massie* (1998) 19 Cal.4th 550, 576.)  The determinative question " 'is whether defendant's choice to confess was not "essentially free" because his will was overborne.' " (*Ibid*.)  " 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' " (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

Defendant argues that his statement to police after his arrest was the product of coercion and thus the trial court should have excluded it and any fruits of the allegedly tainted statement. But defendant's contentions that police detectives negotiated with him by offering "inducements" for his confession and that they threated to accuse his wife of the crimes are belied by the record. The detectives asked defendant questions designed to build rapport but never offered him leniency for his confession and never threatened a harsher penalty if he remained silent. Further, the detectives made clear to defendant they had no influence over how he would be treated in prison or in court. In addition, police detectives told defendant that his wife had implicated him in the crimes and that they would have to "drag" her further into the case if he did not confess. The detectives did not suggest that they would charge his wife with a crime.

It is true that the duration of the interrogation was substantial, and at points defendant showed some signs of fatigue. These factors weigh against the admission of the statement. However, other factors weigh against a finding that the statement was involuntary. Defendant was given numerous breaks, drinks, and food, and he was offered the chance to speak with a lawyer numerous times. He was also given the opportunity to speak with his wife, which he declined. We have previously found that a similarly lengthy interrogation did not amount to coercion under the "totality of the circumstances" where, as here, the defendant was provided with food, drinks, and breaks upon request. (*People v. Hill* (1992) 3 Cal.4th 959, 981, disapproved on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046.) On the whole, and on our independent review of the videotape recording of the confession, we conclude that the prosecution met its burden of establishing by a preponderance of the evidence that defendant's statement was not coerced.

19

## 2. *Testimony of defense forensic expert*

Defendant contends that the trial court erroneously limited his forensic expert's testimony regarding crime scene reconstruction in violation of his state and federal constitutional rights to present a defense, to confront and cross-examine witnesses, to due process, to a fair trial, to a reliable and individualized determination of death eligibility and sentence, and to freedom against cruel and unusual punishment.

Here, and in most other claims, defendant argues that the asserted error violated both his state and federal constitutional rights. "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

### a. *Background*

Toward the end of the prosecution's case-in-chief in the guilt trial, the defense proffered the testimony of Brent Turvey, a forensic expert on crime scene

reconstruction. Defendant proffered Turvey's testimony in part to rebut the testimony of criminalist Kathleen Ciula, who, based on the scene at Mayfair Liquors, had reconstructed the likely sequence of events during the robbery. Defense counsel explained that in addition to his reconstruction of events during the robberies, Turvey would testify that the Cal Spray crime scene showed signs that defendant was experiencing accumulated rage and that the other crime scenes suggested less planning than the Cal Spray robbery. In the expert's opinion, defendant's crimes demonstrated that his ability to plan and deliberate was deteriorating over time.

The trial court expressed concern that Turvey's testimony regarding defendant's state of mind during the commission of the crimes was unreliable. Turvey testified during an evidentiary hearing on July 1, 1999. On July 6, the hearing resumed, and Turvey provided a report to the court and the parties. During the July 6 hearing, defense counsel argued that Turvey's testimony not only was admissible for its own sake but also would provide foundation for the expert testimony of Dr. Woods, the previously mentioned forensic psychologist.

The trial court ruled that Turvey would be allowed to testify regarding crime scene reconstruction and would be allowed to explain which crime scene evidence suggested planning or precautionary behavior. However, invoking its discretion under Evidence Code section 352, the trial court prohibited Turvey from testifying about defendant's mental state during the commission of the crimes. Ultimately, the defense did not call Turvey to testify at the guilt trial or the penalty retrial.

>    b.   *Analysis*

" 'Exclusion of evidence as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is reviewed for abuse of discretion.'

21

[Citation.] But 'exclusion of evidence that produces only speculative inferences is not an abuse of discretion.' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 81, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

To the extent that defendant claims he was denied an opportunity to rebut the testimony of the prosecution's crime scene expert, that claim is unsupported by the record. The trial court permitted Turvey to testify regarding Dr. Ciula's crime scene reconstruction and to offer his own reconstruction.

As to Turvey's potential testimony about defendant's mental state during the commission of the crimes, the trial court did not abuse its discretion in excluding such testimony as unreliable. The defense explained that Turvey would testify that the fact that defendant's series of crimes began with murders of people he knew and transitioned to murders of people he did not know was evidence that defendant's proficiency in committing the crimes deteriorated over time. However, during voir dire, Turvey could not explain to the trial court's satisfaction why this evidence could not more easily be explained by a difference in motives for the two sets of murders. The trial court also found the testimony to require considerable speculation.

Finally, defendant's reliance on our decision in *People v. Davis* (2009) 46 Cal.4th 539 is misplaced. In *Davis*, an expert in psychiatry was allowed to testify about a sexual disorder called "paraphilia" and to describe the characteristics typical of those who have this disorder. (*Id.* at pp. 562, 605.) We deemed it a "close[] question" whether the trial court erred in allowing the expert to testify about whether the defendant's behavior showed signs of paraphilia. But we declined to reach the issue, finding that the testimony was harmless. (*Id.* at p. 605.) *Davis* does not support defendant's argument that the trial court abused its discretion.

22

**B. Issues Recurring in Penalty and Guilt Phases**

Because defendant's first penalty phase ended in a mistrial and a new jury was seated for the penalty retrial where a verdict of death was eventually reached, much of the evidence introduced in the guilt phase was re-introduced at this penalty phase retrial. Defendant challenges a number of evidentiary rulings that were initially made during the guilt phase that also applied during the penalty retrial as the prosecutor and defendant sought to admit or exclude the same evidence for the new jury. Defendant also contends that the trial court erred in denying various defense motions for continuances in both phases.

1. *Exclusion of lay testimony on the effects of methamphetamine*

Defendant claims that the trial court erroneously excluded lay witness testimony on the effects of methamphetamine use during the guilt trial and the penalty retrial.

Before defendant presented his case in the guilt phase, the trial court was informed that defendant intended to present lay testimony on the effects of methamphetamine based on the witnesses' personal experiences with the drug. The prosecutor objected on relevance grounds. The court prohibited lay witnesses from testifying about the effects of drugs but allowed them to testify about their drug-related interactions with defendant and their observations of him, including while he was using drugs. Before calling witnesses, defense counsel indicated that he understood the ruling, had instructed the relevant witnesses not to testify to the effects of drugs on themselves, and knew a violation would lead to sanctions. The court prohibited similar testimony during the penalty retrial.

The Attorney General asserts that defendant failed to preserve this claim under Evidence Code section 353, subdivision (a), because he failed to object to the trial court's ruling on the matter. This is incorrect. Evidence Code section 353 requires "an objection to or a motion to exclude or to strike the evidence" as a

condition precedent to setting aside an "erroneous *admission* of evidence." (Italics added.) Defendant claims an erroneous *exclusion* of evidence. Our review of allegedly erroneous exclusions of evidence is governed by Evidence Code section 354. " 'As a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the "substance, purpose, and relevance of the excluded evidence. . . . " ' " (*People v. Morrison* (2004) 34 Cal.4th 698, 711.) The record shows that defendant did so.

In response to the prosecutor's objections at both the guilt trial and the penalty retrial, the trial court asked defendant to provide an offer of proof for lay testimony on the effects of methamphetamine. Defense counsel argued that defendant's relationship with the witnesses and the witnesses' experiences with methamphetamine were relevant to understanding defendant's mental state. For example, Quigel sold defendant methamphetamine on several occasions, including the night before the Village Oaks Market incident. Defense counsel explained: "[Mr. Quigel] will testify that the drugs are strong, that he used the drugs, himself, he knows the quality of the drugs, he's been an addict for — since he was 17 years old, for roughly six or seven years. And the drugs that he used and that he sold were very, very good quality." Defendant intended to introduce this lay testimony as a foundation for expert testimony on the effects of the methamphetamine defendant used. Defendant thus preserved the claim.

We review a trial court's decision to exclude evidence for abuse of discretion. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) The decision to exclude evidence "will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) The trial court determined that a lay witness's

24

testimony about his own experience with drugs would be of limited probative value and speculative as to defendant's own response to drugs. Furthermore, the court indicated that defendant could introduce evidence of the physical effects of methamphetamine through expert testimony if he so desired, and defendant did. Three experts testified about the effects of methamphetamine on defendant's brain functions, and one expert testified about his capacity to form the requisite mental state for the crimes. The trial court did not abuse its discretion in excluding the lay testimony.

### 2. *Introduction of crime details during cross-examination*

Defendant contends that the trial court erred in allowing the prosecutor to present details of the crimes during his cross-examination of certain defense witnesses during the guilt trial and the penalty retrial in violation of his state and federal constitutional rights to due process and to a reliable and individualized sentencing determination.

### a. *Background*

During both phases of the trial, Dr. Wu and Dr. Amen testified for the defense and opined that defendant suffers from mental disease or brain defects that impair his ability to use proper judgment, to plan, and to inhibit aggressive impulses, especially when using methamphetamine. Dr. Buchsbaum corroborated this testimony during the guilt trial but did not testify during the penalty retrial.

The prosecutor cross-examined each of these witnesses about their knowledge of the details of each crime. Over many defense objections, the trial court allowed this line of inquiry because the experts testified as to the condition of defendant's brain and how that condition affected his ability to maintain organized thinking, including during the commission of the crimes.

25

During the penalty retrial, the defense called Dr. Lisak, a psychiatrist, who opined that a person with low self-esteem, who was molested in adolescence, could feel anger and resentment as an adult. Dr. Lisak also testified that 25 percent of men who had been sexually abused as a child went on to commit acts of violence. Again over many defense objections, the trial court permitted the prosecutor to cross-examine Dr. Lisak about the details of defendant's crimes.

Dr. Woods testified that defendant's heavy use of methamphetamine induced paranoia and caused misperception of reality, including during the commission of the crimes. The trial court allowed the prosecutor to show Dr. Woods numerous photographs of the crime scenes as well as mannequins of Stephen Chacko, Jun Gao, and Besun Yu, and the prosecutor questioned Dr. Woods about his knowledge of the details of the crimes.

Finally, defense witness Guy Lazarro, defendant's former coworker from Florida, testified that he had never observed defendant act violently, that defendant was a good worker, and that he would rehire defendant any time. The trial court permitted the prosecutor to question Lazarro about his knowledge of the victims of each of defendant's crimes.

### b. Analysis

"An expert witness may be cross-examined about 'the matter upon which his or her opinion is based and the reasons for his or her opinion.' [Citation.] The scope of this inquiry is broad and includes questions about whether the expert sufficiently considered matters inconsistent with the opinion. [Citation.] Thus, an adverse party may bring to the attention of the jury that an expert did not know or consider information relevant to the issue on which the expert has offered an opinion." (*People v. Doolin*, *supra*, 45 Cal.4th at p. 434.) "[I]t is well settled that the scope of cross-examination of an expert witness is especially broad; a

26

prosecutor may bring in facts beyond those introduced on direct examination in order to explore the grounds and reliability of the expert's opinion." (*People v. Lancaster* (2007) 41 Cal.4th 50, 105.)

As an initial matter, during the penalty retrial, defendant did not object to the cross-examination of Lazarro on the same ground that he now raises as error. He has thus forfeited this claim. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1214, disapproved on another ground in *People v. Griffin* (2004) 33 Cal.4th 536.)

Although the defense experts had expertise in various scientific and social scientific disciplines, the ultimate point of their testimony was to establish either that defendant did not have the requisite mental state to commit the charged offenses or that his mental, psychological, and emotional profile should be used as a mitigating factor in the penalty phase. Given the nature of this testimony, the prosecutor was permitted in the guilt phase to discredit the witnesses by asking how defendant could have carried out his crimes without the mental faculties that Dr. Amen, Dr. Wu, and Dr. Buchsbaum said were impaired. (See *People v. Smithey* (1999) 20 Cal.4th 936, 961; see also *People v. Doolin*, *supra*, 45 Cal.4th at p. 434 [cross-examination permitted on whether "expert sufficiently considered matters inconsistent with the opinion"].) Similarly, the prosecutor was permitted to ask the sorts of questions to which defense counsel objected in the penalty retrial, as one of the factors for the jury to consider is the "circumstances of the crime." (§ 190.3, factor (a).) Accordingly, the trial court did not abuse its discretion in ruling that the prosecutor was permitted to cross-examine the witnesses about the details of defendant's crimes.

### 3. *Admission of autopsy photographs*

Defendant claims that the trial court prejudicially erred in admitting various autopsy photographs at the guilt trial and the penalty retrial in violation of his state

and federal rights to present a defense, to confrontation, to due process, to a fair trial, to a reliable and individualized determination of death eligibility and sentence, and to freedom from cruel and unusual punishment.

At trial, defense counsel objected to the admission of autopsy photographs on constitutional grounds and on the grounds that they were cumulative and inflammatory. The prosecution argued that the photographs were relevant to show defendant's premeditation and intent to kill based on the angles and positions of the wounds on the victims' bodies. Additionally, the prosecution argued that the photographs were necessary to rebut the defense argument that he was under the influence of methamphetamine because they suggested defendant had good aim.

The trial court ruled admissible and the prosecutor submitted into evidence the following photographs, identified by their prosecution exhibit numbers: (1) No. 101, depicting Loper's fully clothed body on an autopsy table, with mud and dirt on his face and clothes; (2) No. 102, showing the entry and exit wounds on Loper's right arm; (3) No. 103, depicting Loper's body, with blood, and showing various gunshot wounds; (4) No. 104, showing the right side of Loper's body with scrape marks and gunshot wounds on the right arm; (5) No. 105, depicting the left side of Loper's body, showing gunshot wounds and the medical examiner's hand holding Loper's left hand in an unusual position due to his fractured humerus; (6) No. 108, showing Loper's left hand after it had been cleaned, and showing abrasions and scrapes on the hand; (7) No. 110, depicting the right side of Loper's head and showing scrapes on the face; (8) No. 180, showing Chacko's body with injuries on his head; (9) Nos. 181 and 182, depicting the gunshot wounds around Chacko's belt and trousers; (10) No. 185, showing Chacko's body with additional gunshot wounds; (11) No. 187, depicting gunshot wounds on Chacko's chest; (12) No. 189, showing Chacko's bruised head; (13) No. 228, depicting injuries to the left side of Gao's head; (14) No. 229,

28

showing gunshot wounds to Gao's body; (15) No. 230, showing injuries to the right side of Gao's head; and (16) No. 232, showing two gunshot entry wounds on Yu's back.

We review the trial court's decision to admit photographs under Evidence Code section 352 for abuse of discretion. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1351, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) " ' "The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect." ' " (*McKinzie*, at p. 1351.) " 'To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282.)

The trial court did not abuse its discretion. The photographs demonstrate various characteristics of the bullet wounds and other injuries that the victims sustained. At the guilt trial, the photographs were relevant to the issue of defendant's state of mind during the commission of the crimes. They can reasonably be seen as supporting the prosecution's assertion that defendant committed the crimes with the requisite intent to kill and with premeditation. They also could be viewed as rebutting the defense's contention that defendant was impaired by methamphetamine at the time of the crimes. Similarly, in the penalty retrial, the photographs were admissible because they demonstrated the circumstances of the crimes. (§ 190.3, factor (a).)

The photos are "not of such a nature as to overcome the jury's rationality." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 212.) The photos, though depicting homicide victims, are relatively austere and clinical. They are not clearly more prejudicial than probative. The defendant's claim is therefore without merit

29

### 4. *Denials of motions for continuance*

Defendant contends that the trial court erred in denying various defense motions for continuances.

#### a. *Guilt trial*

Defendant filed two motions to continue the start of the guilt trial. The court heard argument on February 25, 1999. In the hearing, the court observed that the motion requested a five-month continuance but did not request the appointment of second counsel. Only on February 22, 1999, three days before the hearing on the second motion, had defendant requested the appointment of second counsel. The court attributed the delay to the public defender's office's "improvident" decision not to request second counsel until after the change of venue motion was granted. The court was also doubtful of the necessity of a continuance because the motion was based in part on defense counsel's difficulty in building rapport with defendant. The court observed that at the time of the hearing the case had been pending for 14 months and that defense counsel, who was known to be a talented trial lawyer, had been working exclusively on this case for nine months. The trial court found that the defense had not established good cause for a continuance but said it would appoint a third attorney to defendant's case if needed. On March 3, 1999, the court denied defendant's motion for reconsideration.

#### b. *Penalty retrial*

On December 28, 1999, defendant filed a motion for a continuance of the penalty retrial on the grounds that the defense needed more time to prepare for the possibility that the prosecution might call additional rebuttal experts and to prepare its own mental health evidence. The prosecution had not filed notice of intent to call new rebuttal witnesses, and the trial court denied the motion for lack of good cause. However, the trial court indicated it would address the possibility

30

of a continuance if it became clear that the prosecution would call additional witnesses and that the defense needed more time to prepare.

On March 7, 2000, after two months of jury selection, defendant filed a second motion to continue the penalty retrial. Defense counsel explained that the motion was similar to the first motion to continue the penalty retrial. The motion included a declaration under seal. The court conducted an in camera hearing on the motion. The court denied the motion but slightly altered the court's schedule.

### c. Analysis

"[T]he decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

In denying the motions for a continuance of the start of the guilt-phase trial, the trial court explained that the case had been pending for 14 months and that defense counsel had been working exclusively on the case for nine months. The court readily assigned a second investigator and a second counsel, and even expressed willingness to grant a third counsel. Regarding the motions brought during the penalty retrial, the trial court determined that the defense did not need more time to develop mental health evidence in order to adequately present its case in mitigation and that it would only grant a continuance based on the possibility that the prosecution would call witnesses not called during the first penalty trial if such events actually transpired. On these facts, we cannot conclude that the trial court abused its discretion in denying the motions. To the extent defendant raises a constitutional claim on the basis of this supposed error, it is without merit.

31

## C. Penalty Phase Issues

### 1. *Penalty phase retrial*

Defendant claims that section 190.4, subdivision (b), which authorizes the court to empanel a second penalty jury after the first penalty jury fails to reach a unanimous verdict, is unconstitutional as applied to him. In particular, he argues: (1) due to alleged prosecutorial misconduct throughout the first penalty trial, the penalty retrial violated his state and federal constitutional rights against double jeopardy and to due process and to fundamental fairness; (2) the penalty retrial, after eight jurors in the first penalty trial voted against the death penalty, violated the Eighth Amendment's guarantee of "heightened reliability" in capital cases; (3) the penalty retrial violated his right to a fair trial; (4) the penalty retrial violated his Eighth Amendment right against cruel and unusual punishment.

The penalty retrial did not violate defendant's state and federal rights against double jeopardy. The federal Constitution prohibits a retrial when the prosecution commits misconduct with the intent to provoke a mistrial. (*Oregon v. Kennedy* (1982) 456 U.S. 667, 675–679.) Similarly, the double jeopardy clause of the California Constitution bars retrial when misconduct "results in a defendant's successful motion for mistrial" and either (1) the prosecution intentionally committed misconduct to trigger a mistrial or (2) the prosecution believed an acquittal was likely, committed misconduct to thwart the acquittal, and the misconduct deprived the defendant of the reasonable prospect of an acquittal. (*People v. Batts* (2003) 30 Cal.4th 660, 665–666.) Double jeopardy principles do not bar retrial if "the mistrial was justified by 'manifest necessity' — for example, a hung jury." (*Id.* at p. 679.) Here, the trial court did not grant defendant's motion for a mistrial; rather, it declared a mistrial on its own initiative because the jury was deadlocked. Further, the record does not show that the prosecutor committed misconduct at the first penalty trial with the intent of triggering a mistrial.

32

Accordingly, the double jeopardy protections of the state and federal constitutions do not bar the penalty phase retrial.

Relying on *State v. Baker* (N.J.Super.Ct.App.Div. 1998) 310 N.J.Super. 128 [708 A.2d 429], defendant further claims that the prosecutorial misconduct in the first penalty phase was so extreme that fundamental fairness prohibits the prosecution from seeking the death penalty in a retrial. In *Baker*, after a verdict of guilt but before the commencement of the penalty trial, the prosecution surreptitiously viewed notes left in the jury room containing a list of reasons to convict or acquit. (*Baker*, at p. 131.) The reviewing court affirmed the trial court's grant of a motion to preclude the prosecution from seeking the death penalty on fundamental fairness grounds. (*Id.* at pp. 136–140.) Even if we were inclined to adopt the principles articulated in *Baker*, those principles do not apply to this case. Defendant has not shown that the prosecutor did anything similar to the prosecutor's actions in *Baker*.

Defendant additionally claims that the penalty phase retrial violated his Sixth Amendment right to a fair trial and his Eighth Amendment rights to "heightened reliability" in a capital case and to be free from cruel and unusual punishment. But as defendant concedes, this court has repeatedly rejected these claims. (*People v. Davenport*, *supra*, 11 Cal.4th at pp. 1192–1194, abrogated on other grounds in *People v. Griffin*, *supra*, 33 Cal.4th at p. 555, fn. 5 [penalty retrial does not violate a defendant's rights to due process, equal protection of the law, a fair trial, or a reliable and proportional sentence under either state or federal Const.]; *People v. Gonzales* (2011) 52 Cal.4th 254, 311 [penalty retrial does not violate the 8th Amend. or "evolving standards of decency"]; *People v. Taylor* (2010) 48 Cal.4th 574, 634 ["a penalty retrial following jury deadlock on penalty does not, in and of itself, establish a violation of the Eighth Amendment or 'evolving standards of decency that mark the progress of a maturing society.' "];

33

*People v. Thompson* (1990) 50 Cal.3d 134, 178 ["The fact that a first jury deadlocked, or the numerical vote of the first jury, is irrelevant to the issues before the jury on a penalty retrial."]; *People v. McDowell* (2012) 54 Cal.4th 395, 411–412 [second penalty retrial after lengthy delays did not constitute cruel and unusual punishment].)  We see no reason to revisit these precedents.

### 2. *Admission of non-statutory evidence in aggravation and rebuttal evidence*

During the penalty retrial, the prosecution was permitted to introduce much of the physical evidence admitted in the guilt trial, including defendant's taped statement to police detectives and a journal that defendant maintained entitled "Biography of a Crime Spree."  Defendant contends that the admission of the evidence amounted to the admission of aggravating evidence not approved by statute.  We disagree.  The evidence presented during the guilt trial, including defendant's statement to police and his journal, was relevant to his state of mind during the commission of the capital crimes.  Accordingly, the trial court did not abuse its discretion in admitting the evidence on the ground that it demonstrated the circumstances of the crime under section 190.3, factor (a).  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1154, overruled in part on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

### 3. *Admission of victim impact evidence*

Defendant claims that the trial court erred in admitting irrelevant victim impact evidence during the penalty retrial in violation of his state and federal constitutional rights to due process, to a fair trial, to confront witnesses, to a reliable and individualized sentencing determination, and to freedom from cruel and unusual punishment.

Before the penalty retrial, defendant filed a motion to exclude certain aggravating evidence, including (1) evidence concerning the effect of the Cal

34

Spray shooting on victim Thomas Harrison, (2) photographs of James Loper while he was alive and of his family members, (3) photographs of Stephen Chacko's funeral in India, (4) photographs of Besun Yu's family and her early life, and (5) mannequins that the prosecutor used to demonstrate the wounds that defendant's victims suffered.

The trial court allowed Harrison to testify that he was shot, injured, and hospitalized, and that he underwent rehabilitation. The court excluded two photographs pertaining to James Loper but admitted the remaining photographs. Finally, during direct and cross-examination, the trial court permitted the prosecution to use wooden mannequins depicting the victims as an aid to questioning witnesses about the gunshot wounds that the various victims sustained.

Victim impact evidence is admissible during the penalty phase of a capital trial. (*People v. Brown* (2004) 33 Cal.4th 382, 396.) Section 190.3, factor (a) permits the prosecution to establish aggravation by offering evidence of the circumstances of the crime, including the impact of the crime on surviving victims and on a victim's family. (*People v. Brown*, *supra*, 33 Cal.4th at p. 396.)

We review the admission of photographs for an abuse of discretion. (*People v. Moon* (2005) 37 Cal.4th 1, 34.) Photographs of the victim while alive and photographs of a victim's family are admissible as "circumstance[s] of the offense" under section 190.3, factor (a). (*People v. Boyette* (2003) 29 Cal.4th 381, 444; *People v. Anderson* (2001) 25 Cal.4th 543, 594; *People v. Lucero* (2000) 23 Cal.4th 692, 714.) The trial court did not abuse its discretion in concluding that the photographs of James Loper and his family, of Besun Yu and her family, and of Stephen Chacko's funeral were admissible under this provision. Nor do we conclude, after reviewing the photographs, that the admission of the evidence was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." (*Payne v.*

*Tennessee* (1991) 501 U.S. 808, 825.) Likewise, the trial court did not abuse its discretion in concluding that the photographs of Stephen Chacko's funeral were not inflammatory and were not likely to be unduly prejudicial.

We have also previously rejected challenges to the prosecution's use of mannequins to represent victims during the presentation of aggravating evidence. (*People v. Medina* (1995) 11 Cal.4th 694, 753–754 [life-sized mannequin representing murder victim admitted into evidence and allowed to remain in the jury room during guilt and penalty phase deliberations]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1291 ["Mannequins may be used as illustrative evidence to assist the jury in understanding the testimony of witnesses or to clarify the circumstances of a crime."].) And we do not find that the trial court abused its discretion in allowing the prosecutor to use the mannequins as a demonstrative aid during direct and cross-examination of witnesses during the penalty retrial.

Finally, defendant argues that the trial court erred in permitting Thomas Harrison to testify concerning his period of rehabilitation because the guilt phase jury did not convict defendant of attempted murder. Prior to the initial penalty trial, defendant submitted a comprehensive motion seeking exclusion of certain victim impact testimony, including from Harrison. Although this written objection argued it would be error for the court to admit "any evidence pertinent to the attempted murder involving the victim Thomas Harrison," defendant narrowed the scope of his objection at a subsequent hearing. At that hearing, Judge Platt and both the prosecutor and defense counsel agreed that the *fact* of Harrison's shooting was admissible as evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" under section 190.3, factor (b). This was also the conclusion reached at a hearing prior to Harrison's testimony during the second penalty trial. At this latter hearing, defendant sought an instruction that the prosecution was not

36

to ask Harrison questions about the long-term medical, emotional, and financial consequences of his injuries so that defendant would not have to object to a sympathetic witness describing his injuries. Defendant, however, agreed that Harrison could testify to the fact "he was shot, the circumstances in which he was shot, the fact that he was hurt, went to the hospital and had rehabilitation."

Defense counsel's statements at this first hearing preserved an objection to any testimony by Harrison that went to the *impact* of his injuries, but defendant conceded the admissibility of the fact and extent of those injuries under section 190.3, factor (b), as violent criminal activity of which the defendant has not been convicted at the second hearing. (See *People v. Cowan* (2010) 50 Cal.4th 401, 489 ["Section 190.3, factor (b), permits the jury to consider in aggravation violent criminal activity by the defendant other than the crimes of which he or she has been convicted in the capital trial, regardless of whether such activity led to a conviction, but precludes consideration of crimes for which the defendant has been prosecuted and acquitted"].) Judge Platt ruled in defendant's favor with respect to this limited objection and admonished the prosecutor accordingly. Harrison's actual testimony did not address the lingering impact of his injuries other than to say, "I have a numbness that runs down inside of my leg. I suffer pain . . . . I'm suffering back pains and, you know, I'm just — my body's not what it used to be." To the extent defendant now argues that Harrison's testimony in its entirety ought to have been excluded as irrelevant under section 190.3, that claim is forfeited.

### 4. *Exclusion of evidence of remorse*

Defendant contends that the trial court abused its discretion in excluding evidence of his remorse, that the prosecutor committed misconduct by arguing in closing argument that defendant lacked remorse, and that these supposed errors

violated his state and federal constitutional rights to due process, to a fair trial, to effective assistance of counsel, to confront witnesses, to present a defense, and to a reliable and individualized sentencing determination. The prosecutorial misconduct claim is addressed below. (*Post*, at pp. 104, 107–108.)

### a. Background

During the first penalty trial, defendant sought to introduce evidence to establish remorse for his crimes. Defendant proffered, inter alia, the testimony of Pastors Steve Kilthau and Troy Skaggs. Skaggs, who ran a prison ministry, initiated contact with defendant shortly after his arrest. Skaggs met with defendant about nine times and corresponded with him for about two years. He reported that defendant expressed remorse for his actions and often wept during their meetings. Skaggs planned to testify he believed defendant was sincerely remorseful.

Kilthau led a congregation at the Stockton Baptist Church, where victim James Loper had been a member. Kilthau initiated contact with defendant six months after his arrest. After corresponding with defendant, Kilthau eventually met with him. During the meeting, and in his letters to Kilthau, defendant expressed remorse. Kilthau would have testified that he believed defendant's remorse was genuine. Defendant also sought to introduce his correspondence with Skaggs and Kilthau as well as his postarrest letters to his family. Finally, defendant sought to introduce the testimony of Dr. George Woods, a psychiatrist, whose direct testimony would include his belief that defendant was truly remorseful.

The trial court excluded the testimony of Kilthau and Skaggs and defendant's correspondence with them. The trial court also redacted nine expressions of remorse in letters from defendant to his family that were otherwise

38

admitted into evidence. The court ruled that this evidence was unreliable because defendant's various expressions of remorse occurred after his arrest, incarceration, and the formulation of his defense strategy, suggesting that the statements were untrustworthy and self-serving and thus amounted to inadmissible hearsay. Further, the expressions of remorse in the letters "directly circumvent[ed] the issue of cross-examination." Similarly, with regard to the letters from Kilthau and Skaggs, the court determined that they were unreliable and could only be admitted if defendant chose to testify.

At first, the trial court did not exclude the testimony of Kilthau and Skaggs on the topic of defendant's remorse. Instead, the trial court ordered defendant to provide a written proffer detailing the content of the conversations between the pastors and defendant and the topics of direct examination. The court sought to fashion a limiting instruction to guide the testimony but noted: "[The testimony] is relevant, and it is admissible under a state of mind issue."

However, on August 20, 1999, three days after the court's initial ruling, and after the prosecution filed a motion to reconsider the introduction of the testimony, the court reversed course. Citing dicta in *People v. Livaditis* (1992) 2 Cal.4th 759 (*Livaditis*), the trial court determined that it had discretion to exclude the testimony if the court found it untrustworthy. The trial court said the timing of the contact between defendant and the pastors rendered the testimony unreliable, explaining: "[W]hen you look at the date of the contact, December of 1998, three months before the first scheduled trial date, over a year after the defendant had been in custody, after there had been considerable examination by the experts in terms of state of mind issues as it related to the guilt phase, after all of that had been explored, after a defense had been explored and prepared in terms of those issues, after all of that and with considerable motive for indicating a remorse and a state of mind that is absolutely, absolutely self-serving under the circumstances,

39

the court would not have given second thought at all to following the line of analysis in *Livaditis*."

On March 7, 2000, during pretrial hearings in the penalty retrial, defendant moved to admit the evidence of remorse that he tried to introduce in the first penalty trial, asking the trial court to change its ruling. The trial court denied the motion, again citing the "logic and dicta in *Livaditis*" and explaining: "I am still in the same position that I was [during the first penalty trial] . . . when I reconsidered and held that Pastor Kilthau and Reverend Skaggs would not be allowed to testify because in my opinion neither reaches, based upon the circumstances that occurred, reaches the level of sufficient reliability to testify as witnesses."

Also during the penalty retrial, defendant filed a motion to admit the testimony of four jurors from the first penalty trial. According to defendant, the jurors would have testified to their observations of defendant's demeanor during the guilt trial and the first penalty trial and that this testimony would help establish defendant's remorse.

The trial court heard argument on the issue and denied the motion for four reasons. First, allowing the testimony of only four out of 12 jurors, all four of whom voted for life without parole during the first penalty trial, would be more prejudicial than probative. Second, if the court allowed the four jurors to testify, fairness would require the trial court to allow the prosecution to call any of the other eight jurors, as well as the courtroom staff and bailiffs, to rebut the testimony of the jurors that defendant called. Third, calling former jurors as witnesses could potentially violate the sanctity of jury deliberations. Fourth, the trial court noted that it could exclude the testimony under Evidence Code section 352 because allowing the testimony would potentially give rise to a "monumental retrial,"

especially if the prosecution chose to call members of the first jury who had voted for death.

### b. Analysis

A capital sentencing decision must be individualized, and the sentencing authority must be permitted to consider the defendant's character. (*Lockett v. Ohio* (1978) 438 U.S. 586, 604 ["[in] all but the rarest kind of capital case, [the sentencer must] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (fn. omitted)]; *Eddings v. Oklahoma* (1982) 455 U.S. 104, 114 [holding that a sentencer may not be precluded from considering "any relevant mitigating evidence"].) Section 190.3 requires the jury to impose a sentence of life imprisonment without the possibility of parole if the mitigating factors outweigh the aggravating factors, and, as the high court has observed, factor (k) of section 190.3 directs the jury to consider any "circumstance that might excuse the crime, and it is not unreasonable to believe that a post-crime character transformation could do so. . . . [R]emorse, which by definition can only be experienced after a crime's commission, is something commonly thought to lessen or excuse defendant's culpability." (*Brown v. Payton* (2005) 544 U.S. 133, 142–143.)

Although defendant had a constitutional right to have the jury hear all mitigating evidence counseling against the death penalty, "a capital defendant has no federal constitutional right to the admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination." (*People v. Jurado* (2006) 38 Cal.4th 72, 130.) Under Evidence Code section 352, a trial court has broad discretion to exclude evidence "if its probative value is

substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In addition, statements from a defendant to a third party regarding the defendant's state of mind can be admissible, but not when made under circumstances that indicate a lack of trustworthiness. (Evid. Code, §§ 1250, 1252.)

We review a trial court's decision to exclude evidence for abuse of discretion. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1181.) The decision to exclude evidence "will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9–10.) Here, we cannot conclude that the trial court abused its discretion in excluding defendant's statements of remorse to Kilthau and Skaggs and to his family members or in excluding the testimony of the four jurors from the first penalty trial.

Defendant's statements to Kilthau and Skaggs and to his family were hearsay and were made after defendant's attorneys had begun to work on his defense. Under these circumstances, the trial court could reasonably conclude that the hearsay statements could be excluded as unreliable under Evidence Code section 1252. On the same basis, the trial court could also reasonably conclude that defendant's statements of remorse in his letters to his family were also unreliable under section 1252. We have previously held that a trial court acted within the bounds of its discretion in excluding similar evidence of remorse as unreliable hearsay evidence. (*People v. Smith* (2003) 30 Cal.4th 581, 629.)

Nor did the exclusion of Kilthau's and Skaggs's testimony violate defendant's federal constitutional right to present mitigating evidence under *Payne v. Tennesse*, *supra*, 501 U.S. 808, 822, or his federal constitutional right to due

42

process.  The trial court, in ruling on the admissibility of this testimony, relied on *Livaditis*, *supra*, 2 Cal.4th 759, 780, to conclude that he was not required to admit remorse evidence in a form inadmissible under state law.  Where evidence of remorse is so unreliable as to be inadmissible under California law, the exclusion of such evidence does not violate the general federal constitutional rule that evidence that is reliable but otherwise inadmissible under state law must be admitted if highly relevant to a critical issue in the punishment phase.  (*Id.* at p. 780; see also *People v. Edwards* (1991) 54 Cal.3d 787, 837–838, citing *Green v. Georgia* (1979) 442 U.S. 95, 97.)  "The court did not prevent defendant from presenting evidence of remorse, but only evidence in the form of inadmissible hearsay not subject to cross-examination."  (*People v. Livaditis*, *supra*, 2 Cal.4th at p. 780.)  Specifically, defendant was allowed to introduce Dr. Woods's testimony that defendant was "truly remorseful," had "accept[ed] responsibility" for his crimes, and that he had cried multiple times during interviews and felt "terrible" for what he had done.  Defendant was not denied his federal right of due process by the exclusion of unreliable hearsay evidence as to his remorsefulness.

Further, the trial court did not abuse its discretion in excluding the testimony of the four jurors.  Even in the penalty phase the trial court " ' "determines relevancy in the first instance and retains jurisdiction to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." ' "  (*People v. Williams* (2006) 40 Cal.4th 287, 320; see *People v. Salcido* (2008) 44 Cal.4th 93, 162.)  The trial court could have reasonably concluded that the admission of their testimony would be more prejudicial than probative and would confuse jurors for the penalty retrial about the ultimate task.  The trial court also could have reasonably concluded that their testimony would

43

have opened the door for the prosecution to call other individuals who attended the first penalty trial, thus expending an undue amount of the court's time.

### 5. *Exclusion of mitigating evidence of molestation*

Defendant contends that the trial court erroneously excluded evidence proffered to corroborate Dr. White's testimony that defendant had been molested as a teenager. He maintains that the erroneous exclusion of this evidence violated his state and federal constitutional rights to present a defense, to confrontation, to due process, to a fair trial, to a reliable, individualized determination of death eligibility and sentence, and to freedom from cruel and unusual punishment.

### a. *Background*

Defendant was interviewed by defense expert Dr. Gretchen White, a psychologist and social historian. According to Dr. White, defendant confided in her that on two occasions he had been sexually molested by John Fry, his youth intake counselor when he was a ward of the State of Florida as a teenager. Dr. White also spoke with two other men, Michael Portbury and David Lamson, who claimed to have been sexually molested by John Fry under similar circumstances. She also spoke with two Florida police officers who investigated John Fry.

During the first penalty trial, the defense proffered Dr. White's testimony that defendant had told her that he had been molested and that she believed him. The defense also proffered the testimony of Lamson and Portbury in order to corroborate defendant's statement that Fry had molested him and to establish the effects of Fry's molestation on Lamson's and Portbury's development and, by extension, defendant's development. Defendant also sought to introduce the testimony of the police investigators into the molestation allegations.

The trial court ruled that the testimony of Lamson, Portbury, and the two police investigators was inadmissible because it was irrelevant and was more

44

prejudicial than probative. The court allowed Dr. White to testify that defendant had told her he had been molested by Fry and allowed the defense to introduce court documents from Florida showing that Fry had been convicted of procuring a child under the age of 16 for prostitution. The court also allowed Dr. Lisak, the previously mentioned clinical psychologist, to testify about the psychological and emotional effects that a traumatic sexual experience can have on an adolescent boy.

During the prosecutor's cross-examination of the defense experts and during his closing argument in the first penalty trial, he attempted to cast doubt on the fact that defendant was ever molested and the credibility of the experts' opinions.

During the penalty retrial, the defense sought to question Dr. White about the details of her interviews with Lamson and Portbury rather than introduce the testimony of Lamson and Portbury directly. Defense counsel argued that the statements were necessary to corroborate defendant's allegations of molestation and to bolster the credibility of Dr. White's opinion, especially in light of the prosecutor's argument in the first penalty trial that there was no evidence that defendant had been molested. During the hearing on the motion to admit the testimony, the court asked the prosecutor whether he would stipulate that defendant was molested by Fry, and the prosecutor declined. The court then agreed to allow Dr. White to testify that her interviews with Lamson and Portbury supported her opinion that defendant had in fact been molested. However, the court refused to allow Dr. White to testify about the details of her interviews with Lamson and Portbury. The court explained: "The manner in which [defendant] was molested carries far less probative value than the fact that he was on [*sic*] or wasn't molested. [¶] So when I do a 352 analysis, as I did before, as I've done again, that's what to have look at. I've got to look not just at the prejudicial effect,

45

but I've got to look at the potential probative value. [¶] That issue is available to be established by other means, which the court has allowed. So the probative value of the manner of the molest, or the manner of the other person's molest is extremely little, in my opinion. And the probative — or the prejudicial effect is great. Because it does open significant doors and collateral issues. [¶] And that's the basis for the opinion. I don't have a problem with, as I think you are entitled to say, my expert did contact other persons; and in her opinion, then confirms and corroborates the issue. [¶] That I think is fair game." Thus, the court ruled that the details of the molestations that Portbury and Lamson reported to Dr. White were more prejudicial than probative under Evidence Code section 352, as they would introduce new issues and consume significant time without offering much insight into defendant's own experiences. The court also noted that the admitted record of Fry's conviction contained Portbury's name, which additionally served to corroborate defendant's claim.

During the prosecutor's closing argument during the penalty retrial, he made the following two remarks in passing: (1) "Number one, we have no proof of a molest. . . . Absolutely no relevance to this case" and (2) "[Dr. Lisak] was here to testify about generalities based on the hypothetical male. It's in your notes. I mean, I actually — I just put it in the simplest terms I can think of. You're here to testify about the hypothetical male, correct? Yes. What conclusions do you draw about this case. No. Zero. Zip. [¶] Mitigation value? Nothing. I mean, how does that compare. I don't even — I don't even understand. [¶] Dr. Lisak is a professor who teaches, who seems like a nice guy. He's a professor. He's telling you about possibilities, maybe's, could have's, should have's, would have's. Value, zero." Following the prosecution's closing argument, defense counsel filed a motion for mistrial based on these two statements. The trial court denied the motion.

46

### b. *Limitation on the testimony of Portbury, Lamson, and Dr. White*

Defendant contends that the trial court erred in excluding the testimony of Portbury and Lamson and in prohibiting Dr. White from the testifying about the details of the molestations Portbury and Lamson recounted to her.

To the extent that defendant claims the trial court erred in excluding the testimony of Portbury and Lamson during the first penalty trial, the Attorney General argues that claim is moot. We agree. To the extent that defendant claims the trial court erred in excluding the testimony of Portbury and Lamson during the penalty retrial, the Attorney General argues that the claim is forfeited because the defense did not proffer their testimony during the penalty retrial. Defendant responds that proffering the testimony of Lamson and Portbury would have been futile in light of the fact that Judge Platt had incorporated his previous rulings into the penalty retrial proceedings.

The record indicates that at the start of the penalty retrial, defense counsel asked the trial court whether its prior rulings remained in effect such that defense motions already made need not be filed again in order to make a record:

"MR. LAUB: . . . . [W]e are anticipating that the prosecution in the penalty phase retrial is going to introduce a lot of evidence that was part of their guilt phase trial under the umbrella of circumstances of the crime. And in order for us to know that we are making a record, I guess what we are concerned about is if we are not now presenting these issues again, do we have, anything that's been litigated remains, our position remains as it was.

"THE COURT: Correct.

"MR. LAUB: We haven't waived anything by not reintroducing anything.

"THE COURT: No. You do not need to refile each and every motion that was previously had. Those rulings are equally binding at this phase of the trial,

47

even if this were and there had not been an intervening phase of the trial for which there was a hung jury."

Because the record indicates that the trial court informed defense counsel that its prior rulings remained binding at the penalty retrial, defendant has preserved his claim that the trial court erred in excluding the testimony of Portbury and Lamson by proffering their testimony at the first penalty trial. In light of the court's statements above, defendant would have understood the court's ruling excluding the testimony of Portbury and Lamson to be equally applicable to the penalty retrial. Nonetheless, the trial court did not err in excluding the testimony of Portbury and Lamson or in limiting the testimony of Dr. White.

The trial court determines the "relevancy of mitigating evidence and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1145, overruled in part on other grounds in *People v. Rundle*, *supra*, 43 Cal.4th at p. 151; see Evid. Code, § 352.) Here the trial court reasonably determined that admitting detailed testimony from two individuals regarding their own molestation, or hearsay testimony by Dr. White as to those two individuals' experiences, would open the door to a "mini-trial" regarding the accuracy of any particular detail Portbury and Lamson recounted. Accordingly, the trial court allowed Dr. White to testify that she had been told by Portbury and Lamson that they had been molested, without allowing Portbury and Lamson to testify themselves. Because Portbury and Lamson would not have testified about whether defendant *himself* was molested, the trial court's ruling was a reasonable way of allowing defendant to bolster the credibility of his expert witness without creating a distracting dispute over the credibility of Lamson and Portbury themselves.

48

### c. Denial of motion for mistrial

Defendant claims that the court erred in denying the motion for mistrial based on the prosecutor's misconduct in arguing there was "no proof of molest." We consider and reject this claim below. (*Post*, at p. 104)

### 6. Cross-examination of prosecution expert witness and related jury admonition

Defendant contends that the trial court improperly limited cross-examination of prosecution expert Dr. Helen Mayberg and improperly admonished the jury regarding two questions that defense counsel posed to Dr. Mayberg. He maintains that these alleged errors violated his state and federal constitutional rights to confrontation, to due process, to a fair trial, to present a defense, to a reliable and individualized sentencing determination, and to freedom against cruel and unusual punishment.

### a. Background

Before trial, defendant was examined by Dr. Wu and Dr. Amen. Dr. Wu, a psychiatrist, was qualified as an expert in positron emission tomography. Dr. Wu performed a PET scan on defendant and he testified that the PET scan showed defendant's brain was abnormal. Dr. Amen, also a psychiatrist, was qualified as an expert in clinical psychiatry with a specialty in brain imaging. He performed SPECT scans on defendant and testified that the scans showed a functionally damaged brain that affected defendant's thought process and that defendant's methamphetamine use exacerbated his condition. The defense also called a third psychiatrist, Dr. Buchsbaum, who qualified as an expert in nuclear imaging science. Dr. Buchsbaum reviewed the scans performed by Dr. Wu and Dr. Amen and corroborated their conclusions. The defense presented the testimony of the three psychiatrists during the guilt phase to provide the jury with a basis for

49

concluding that defendant did not form the specific intent required for murder or robbery.

In rebuttal, the prosecution called Dr. Mayberg, a board-certified neurologist. Dr. Mayberg reviewed the tests performed by Dr. Wu and Dr. Amen and criticized their conclusions and the conclusions of Dr. Buchsbaum. In preparation for her testimony, Dr. Mayberg wanted to see the "raw data" underlying the tests of Dr. Wu and Dr. Amen, and the prosecution filed a discovery request. Neither the prosecutor nor defense counsel knew exactly what Dr. Mayberg meant when she requested the "raw data." But during the second day of Dr. Mayberg's testimony, it became apparent that she had not received all the information that she had requested. Eventually the defense provided the data, and the court recessed to allow her time to review the data.

When Dr. Mayberg's testimony resumed, she criticized the defense experts' opinions on the ground that the PET scan was "normal-appearing" and more consistent with depression than trauma or long-term use of methamphetamine. She opined that the defense experts' conclusions were unsupported by the statistics upon which they claimed to rely. And she referred to the raw data from the SPECT scans as "garbage," a term that was stricken after defense counsel objected.

During the penalty retrial, the defense called Dr. Amen and Dr. Wu, who provided the same testimony that they provided in the guilt phase, this time as mitigation evidence. The defense did not call Dr. Buchsbaum during the penalty retrial. The prosecution called Dr. Mayberg, whose rebuttal testimony was similar to her testimony during the guilt phase. On direct examination, she testified about the information she reviewed to prepare for the penalty retrial. In particular, she noted she had reviewed the transcripts of the previous phases of the trial. On cross-examination, defense counsel attempted to question Dr. Mayberg about the

testimony of Dr. Buchsbaum, which Dr. Mayberg said she had read before testifying as a rebuttal witness in the first penalty trial. The prosecutor objected to this line of inquiry, and the defense was given the opportunity to lay appropriate foundation outside the presence of the jury.

Defense counsel argued that because Dr. Mayberg had testified she had reviewed Dr. Buchsbaum's opinions and compared them with those of the other two defense experts, Dr. Buchsbaum's testimony was foundational to her conclusions during the guilt phase. Further, because Dr. Mayberg would offer the same conclusions during the penalty retrial that she had offered during the guilt phase, she must have relied on Dr. Buchsbaum's testimony in forming the opinions she would provide during the penalty retrial.

The trial court rejected this argument: "There has been an inappropriate foundation laid, insufficient to justify questioning this witness or this expert about Dr. Buchsbaum's opinion. There is nothing I've heard that said that her opinion here is based upon Dr. Buchsbaum's testimony. . . . [¶] . . . [¶] You cannot simply argue that anything that she has ever read can be questioned and examined. If it was not relied upon to express her opinion, it is not admissible within the expert opinion." When the defense was allowed to reopen examination, Dr. Mayberg claimed that she "did not rely on Dr. Buchsbaum at all," as Dr. Buchsbaum had not performed any scans of his own. The next day, defense counsel reargued his position from the prior day. The trial court ruled that defense counsel could not question Dr. Mayberg about Dr. Buchsbaum's testimony because parties are generally "not allowed to use prior testimony of an individual for cross-examination purposes without presenting that witness first and/or having it considered."

During subsequent cross-examination, defense counsel attempted to question Dr. Mayberg about her characterization of the SPECT scans as "garbage"

51

before she received the raw data on which her opinion was ultimately based. Defense counsel then asked Dr. Mayberg why she "came to court" when she "didn't have all the materials necessary to render an opinion." The prosecutor objected, and the trial court held a hearing outside the jury's presence. During the hearing, the court ruled that it would admonish the jury that defense counsel's question about Dr. Mayberg's characterization of the scans as "garbage" was improper because that testimony had been stricken in the guilt phase. The trial court would also inform the jury that the defense did not provide Dr. Mayberg with the raw data she requested until the day Dr. Mayberg testified.

The trial court admonished the jury as follows: "Ladies and gentlemen, before we proceed, I need to advise you of a couple of things. [¶] First involved the question about the prior testimony, that of the doctor referenced Dr. Amen's materials as garbage was stricken from the record. [¶] That means it is [n]on testimony. That means it should not have been referenced in any fashion for any reason. And it was extremely improper for [defense counsel] to do so before you. [¶] It is again stricken. Period. It was improper questioning. Should not have been done. [¶] More importantly, the issue of the information provided the day Dr. Mayberg testified. [¶] What occurs in any criminal matter, [] civil cases for that matter as well — what occurs is what is called discovery compliance. Where information in one side's possession is ordered to be turned over to the opposition or other side. Either the defense to the prosecution or the prosecution to the defense. [¶] [The prosecutor] has made numerous discovery requests as to this specific information, which was not provided. It was untimely when it was finally provided after Dr. Mayberg had arrived and was to testify. So it was information that should have been provided earlier and was not."

52

### b.  *Limitation of cross-examination of Dr. Mayberg*

Defendant contends that by limiting cross-examination on the subject of Dr. Buchsbaum's testimony, the trial court inhibited defense counsel's ability to challenge Dr. Mayberg's credibility in violation of his constitutional right "to be confronted with the witnesses against him." (U.S. Const., Amend. VI.)  We review this claim for abuse of discretion.  (*People v. Linton*, *supra*, 56 Cal.4th at p. 1188; see *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.)  Evidence Code section 721, subdivision (a) provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion."

Defendant's brief may be construed to offer two potential grounds for concluding that cross-examination regarding Dr. Buchsbaum's testimony was proper.  First, defendant contends that Dr. Mayberg relied on this testimony in forming her opinion.  But, as the Attorney General observes, Dr. Mayberg testified that she had *reviewed* Dr. Buchsbaum's testimony before the beginning of the penalty retrial, but she maintained that her opinion was not *based on* that testimony.  This characterization of her opinion appears correct.  Dr. Wu and Dr. Amen conducted PET and SPECT brain scans on defendant and testified about the results of those scans.  Dr. Buchsbaum reviewed the scans of Dr. Wu and Dr. Amen and testified that he agreed with their conclusions.  Dr. Buchsbaum did not produce scans of his own.  In rebuttal, Dr. Mayberg reviewed the scans conducted by Dr. Wu and Dr. Amen and testified that she disagreed with the conclusions of the defense experts.  Thus, although her opinion about the results of the PET and SPECT scans allowed her to criticize the testimony of Dr. Buchsbaum in the guilt phase, her opinion was not *based on* Dr. Buchsbaum's testimony.  Thus, the trial

53

court did not abuse its discretion in sustaining the prosecution's objection to this line of questioning.

Second, by citing our decision in *People v. Clark* (1995) 5 Cal.4th 950, defendant's brief may be construed to assert that questioning Dr. Mayberg about Dr. Buchsbaum's testimony was proper because Dr. Mayberg was familiar with Dr. Buchsbaum's professional publications. (Cf. *Clark*, at p. 1013 [finding cross-examination about the "scholarly work" of another expert to be proper], disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn 22.) But *Clark* is inapposite. In *Clark*, we held that a psychiatrist could be asked about another psychiatrist's scholarly work with which the witness was familiar. (*Ibid.*) Here, defense counsel did not attempt to question Dr. Mayberg about one of Dr. Buchsbaum's scholarly publications. Instead, defense counsel attempted to question Dr. Mayberg about Dr. Buchsbaum's testimony during a prior phase of trial. In these circumstances, the trial court could justifiably be concerned that defense counsel was attempting to elicit Dr. Buchsbaum's hearsay opinion through cross-examination of Dr. Mayberg without calling Dr. Buchsbaum to the stand. Accordingly, the trial court did not abuse its discretion in limiting this line of examination.

### c. *Jury admonitions*

Defendant contends that the trial court's admonition to the jury was improper. Specifically, defendant complains that the admonition "singled out" defense counsel and wrongly suggested that defense counsel had committed a discovery violation. Defendant also argues that the trial court erred in failing to instruct the jury not to impute any discovery violation to him.

To be sure, the trial court did single out defense counsel for referring to stricken testimony in one of his questions to Dr. Mayberg. But that admonition

54

was appropriate under the circumstances as the question referred to facts not in the record. Moreover, the trial court's admonition to the jury regarding defense counsel's cross-examination of Dr. Mayberg regarding her supposed willingness to testify in the absence of data was appropriate under the circumstances.

Defendant relies on *People v. Bell* (2004) 118 Cal.App.4th 249 (*Bell*), which found prejudicial error in the trial court's use of CALJIC No. 2.28 to inform the jury about the untimely provision of evidence by defense counsel. That court emphasized two aspects of the instruction: First, the instructions stated that " '[i]n this case, the Defendant failed to timely disclose the following evidence. . . . ' " (*Bell*, at p. 254.) Second, "jurors were told '[t]he weight and significance of any delayed disclosure are matters for your consideration,' " but not told how or whether the prosecution was prejudiced by the late disclosure and instead "simply left to speculate . . . that the People were put at an actual disadvantage because of the late discovery." (*Id.* at p. 255.)

The facts in this case are distinguishable. Here, defense counsel attempted to demonstrate that Dr. Mayberg was willing to testify in the absence of sufficient evidence or information to support that testimony. The court permitted defense counsel to ask that question, but sought — upon the prosecutor's objection — to clarify for the jury that the *reason* Dr. Mayberg lacked evidence was that defense counsel had failed to comply with a discovery order. Although the trial court could have been clearer in attributing the noncompliance to counsel, his use of the phrase "the defense to the prosecution" did not assign blame to defendant, as did the trial court's instruction in *Bell*. Nor did the trial court instruct or even imply to the jury that the weight or significance they assigned Dr. Mayberg's testimony ought to be affected by the late disclosure. The force of the trial court's admonition was to correct a possible misperception on the part of the jury that Dr. Mayberg had engaged in an impropriety in her prior testimony, and to prevent

defense counsel from taking advantage of a situation he had created during the earlier proceedings.  Such an admonition was in the discretion of the trial court and did not implicate the concerns of *Bell*, as it could not be reasonably interpreted to cast aspersions on defendant himself and did not instruct the jury to alter the weight assigned the evidence presented.

### 7.  *Failure to restrict cross-examination of defendant*

Before the penalty retrial, defendant filed a motion to restrict the prosecution's cross-examination of him should he decide to testify.  In the motion, defendant sought to limit the prosecution's cross-examination to his general personal history, which was the topic about which he planned to testify.  The trial court declined to rule on the motion because it had not heard the scope of the testimony on direct examination.  In so ruling, the trial court did not err.  The trial court indicated its willingness to limit the scope of cross-examination to those addressed during direct examination.  In explaining its decision to defer a ruling on the motion, the trial court acknowledged the general law that cross-examination is limited by the scope of direct examination.  But the trial court reasonably refused to rule of the scope of cross-examination without first hearing the scope of the direct examination.  (See *People v. Panah* (2005) 35 Cal.4th 395, 437 ["the trial court properly declined to provide a ruling in advance of defendant's testimony"]; *People v. Keenan* (1988) 46 Cal.3d 478, 513 ["[l]acking complete information" as to the defendant's testimony, "the court was well within its discretion to defer its decision "on the scope of cross-examination].)  We therefore deny defendant's claim that this ruling violated his federal constitutional right to present mitigation evidence as well.

56

## 8. *Rejection of proposed jury instructions*

Defendant contends that the trial court erred in refusing to modify the jury instructions during the penalty retrial in violation of his state and federal constitutional rights to due process, to a fair trial, to a reliable individualized sentence determination, and to freedom from cruel and unusual punishment.

"In assessing whether the jury was adequately guided under the Eighth or Fourteenth Amendment, we ask 'whether there is a reasonable likelihood the jury understood the charge as defendant asserts. [Citations.] We determine how it is reasonably likely the jury understood the instruction, and whether the instruction, so understood, accurately reflects applicable law. [Citations.]' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1161.) "[T]he standard CALJIC penalty phase instructions 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.' [Citation.] Moreover, the general rule is that a trial court may refuse a proffered instruction if it is an incorrect statement of law, is argumentative, or is duplicative. [Citation.] Instructions should also be refused if they might confuse the jury." (*People v. Gurule* (2002) 28 Cal.4th 557, 659.)

Defendant claims that the trial court erred in refusing the following sets of instructions:

First, defendant maintains that the trial court should have modified the standard instructions to further guide jurors in understanding their responsibilities as penalty phase jurors. In particular, defendant asked that the jurors be instructed as follows: "Your responsibility in the penalty phase is not merely to find facts, but also — and most important — to render an individualized, moral determination about the penalty appropriate for the particular defendant — that is, whether he should live or die." The trial court correctly ruled that this instruction was duplicative of CALJIC 8.88, which "properly instructs the jury on its

57

sentencing discretion and the nature of its deliberative process." (*People v. Valencia* (2008) 43 Cal.4th 268, 310.)

Second, defendant contends that the trial court erred in rejecting proposed instructions on the limitations of factors in aggravation. Proposed instructions Nos. 7 and 8 would have instructed the jury that the guilt phase verdicts and special circumstance findings were not aggravating factors. There is no reasonable likelihood that the jurors misunderstood this aspect of their responsibilities. CALJIC No. 1.00 explained that the fact of being arrested, charged, and brought to trial was not evidence in aggravation. Further, CALJIC No. 8.85 enumerated the applicable factors to consider, including aggravating factors, and emphasized that these were the only factors that could be considered in aggravation.

Third, defendant maintains that the trial court should have provided proposed instructions Nos. 11–18, and 21, which would have further guided the jury on factors in mitigation. As a threshold matter, defendant has forfeited his challenge to the trial court's refusal to give proposed instruction No. 11. During the second conference on jury instructions, the trial court indicated that the proposed instruction was more appropriate for argument than for jury instructions. Defense counsel replied, "I'll argue it." Even were defendant's challenge not forfeited, we have previously rejected the claim that the trial court is required to instruct the jury "that one mitigating factor could outweigh multiple aggravating factors." (*People v. Jones* (2012) 54 Cal.4th 1, 79–80.)

Regarding proposed instructions Nos. 12–18, defendant argued that they were necessary to clarify the nature of mitigation evidence. But the trial court concluded that the proposed instructions Nos. 12–15 were duplicative of CALJIC Nos. 8.85 and 8.88 and that Nos. 16–18 were argumentative. We have previously held identical language to defendant's proposed instructions Nos. 12–14, which

58

address the "unlimited" breadth of mitigating evidence to be duplicative of CALJIC Nos. 8.88 and 8.85, subdivision (k), which, respectively, define mitigating circumstances broadly and allow the jury to consider " 'any other circumstance which extenuates the gravity of the crime . . . and any sympathetic or other aspect of the defendant's character or record . . . whether or not related to the offense for which he is on trial' " as a mitigating factor. (*People v. Jones*, *supra*, 54 Cal.4th at pp. 82–83.)

Proposed instruction No. 15 would have added to CALJIC No. 885 the following: "Since you, as jurors, decide what weight to be given the evidence in aggravating and the evidence in mitigation, you are instructed that any mitigating evidence standing alone may be the basis for deciding that life without possibility of parole is the appropriate punishment." We have previously rejected the claim that CALJIC No. 8.88 must explicitly instruct jurors that a single mitigating factor is sufficient to return a verdict of life without possibility of parole, instead holding that this substance is conveyed by CALJIC No. 8.88's charge that, "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without the possibility of parole." (*Id.* at pp. 78–80 [listing citations]; see also *People v. Valencia*, *supra*, 43 Cal.4th at p. 310 ["CALJIC No. 8.88 properly instructs the jury on its sentencing discretion and the nature of its deliberative process."])

We have found that a trial court did not err in rejecting the language of proposed instruction No. 16 ("You may spare the defendant's life for any reason you deem appropriate and satisfactory") in favor of CALJIC No. 8.88, which informs jurors they may weigh mitigating and aggravating circumstances however they deem appropriate. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1135.)

59

We have declined to find error where the trial court refused to give an instruction identical to proposed instruction No. 17 ("You need not find any mitigating circumstances in order to return a sentence of life imprisonment without possibility of parole. A life sentence may be returned regardless of the evidence") for two reasons: The first sentence was duplicative of CALJIC No. 8.85, which instructs jurors that they may consider "any other circumstance which extenuates the gravity of the crime" and CALJIC No. 8.88, which instructs jurors to assign, to any mitigating factors found as a result, "whatever moral and sympathetic value" to the factors that they wish (*People v. Hughes* (2002) 27 Cal.4th 287, 403). The second sentence "is wrong to the extent that it invites the jury to act without regard to the evidence" (*People v. Lenart*, *supra*, 32 Cal.4th at p. 1135).

As to proposed instruction No. 18, which would have made explicit that jurors were not required to reach unanimity as to the existence or weight of any factors in mitigation, we have held the trial court is "not required to instruct [the jury] that unanimity is not required before a juror may consider evidence to be mitigating," (*People v. Coddington* (2000) 23 Cal.4th 529, 641), and that, accordingly, the trial court did not err in refusing to instruct the jury with language nearly identical to that proposed here. (*People v. Chism* (2014) 58 Cal.4th 1266, 1329, cert. den. *sub nom. Chism v. California* (2014) __ U.S. __, 135 S.Ct. 403.)

Proposed instruction No. 21 stated that jurors must resolve reasonable doubt as to penalty in favor of life in prison without parole. The trial court correctly determined that this was an incorrect statement of law, citing our decisions in *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1270, and *People v. Hines* (1997) 15 Cal.4th 997, 1069.

Fourth, defendant contends that the trial court erred in rejecting instructions providing guidance on weighing factors in aggravation and mitigation. Proposed

60

instruction No. 22 would have instructed the jury to find beyond a reasonable doubt that factors in aggravation outweighed factors in mitigation. The trial court correctly denied this instruction on the ground that it was contrary to state law. (*People v. Jones* (1998) 17 Cal.4th 279, 314.) Proposed instruction No. 23 stated that each juror must determine the appropriate penalty for himself or herself and not decide issues by chance. The trial court reasonably rejected this instruction because CALJIC No. 17.40 adequately instructed the jurors on these points.

Proposed instruction Nos. 24 and 24A instructed the jurors on the possibility and consequences of a hung jury. The trial court correctly concluded that these instructions were unnecessary. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1352 ["a trial court is not required to educate a jury concerning the consequences of a deadlock"].)

Proposed instruction No. 24B would have replaced the word "warranted" in CALJIC No. 8.88 with the word "justified." The trial court properly concluded that CALJIC No. 8.88 was adequate as written. (*People v. Page* (2008) 44 Cal.4th 1, 56–57.) Similarly, the trial court correctly refused to give proposed instruction No. 24C because it was "just an alternative definition to 'mitigating circumstances.' "

Proposed instruction No. 26 was a modified version of the concluding instruction governing the conduct of jurors during deliberations. The trial court correctly ruled that the standard instructions were already adequate and correct.

Proposed instruction No. 27 was a modified version of CALJIC No. 17.49. The trial court rejected the instruction because it appeared to require a special finding or statement of reasons supporting the verdict. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 82, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th 390.)

61

Proposed instruction No. 28 would have instructed the jury that sympathy for the defendant's family is not a factor in mitigation but that the jury may consider the testimony of family members to the extent that it illuminates some positive quality about the defendant. Although the trial court allowed defendant's brother to testify regarding the potential impact of defendant's death on his family, the trial court properly ruled that the instruction was argumentative. The trial court also could have rejected the proposed instruction on the ground that it was duplicative of CALJIC No. 8.85. (See *People v. Romero* (2008) 44 Cal.4th 386, 425–426.)

Proposed instruction No. 29 was a modified version of CALJIC No. 8.85, which proposed striking factors that were not relevant to the case and including 33 mitigating factors not ordinarily contained in CALJIC No. 8.85. The trial court properly rejected this instruction, as CALJIC No. 8.85 is an adequate and correct instruction. The court is not required to remove inapplicable factors from CALJIC No. 8.85 (*People v. Rogers* (2009) 46 Cal.4th 1136, 1179) and is not required to enumerate potential factors in mitigation (*People v. Noguera* (1992) 4 Cal.4th 599, 648).

9. *Denial of motions for mistrial and to recuse Judge Platt*

a. *Background*

During the first penalty phase trial, Judge Platt suffered a mild heart attack and disclosed his condition to the jury to explain irregularities in the court's schedule. Defendant moved for a mistrial and to recuse the judge pursuant to Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(i) ("The judge believes his or her recusal would further the interests of justice") and (a)(7) ("By reason of permanent or temporary physical impairment, the judge is unable to properly perceive the evidence or is unable to properly conduct the proceeding").

62

In his motions, defendant argued that Judge Platt's disclosure aroused the jury's sympathy and, as a result, put defense counsel between a rock and a hard place. With each decision at trial, defense counsel was forced to choose between abstaining from legitimate objections and zealously advocating for defendant's defense, potentially alienating the jury and jeopardizing Judge Platt's health. Putting defense counsel to these impossible decisions, defendant argued, prejudiced his case during the penalty phase.

Judge Platt struck the motion to recuse from the record for failure to state sufficient legal grounds. He explained that he did not believe his recusal would further the interests of justice and "there is no indication nor information nor facts presented in the affidavit that indicate that the judge is unable to properly perceive the evidence or is unable to properly conduct the proceedings." Judge Platt nonetheless forwarded the motion to recuse to Presiding Judge Sarkisian of Alameda County Superior Court.

Shortly thereafter, Judge Platt suffered a second heart attack, and Judge Delucchi was assigned to the case. Defendant again moved for a mistrial, and the court denied the motion. Despite Judge Delucchi's assignment to the case, defendant proceeded with the hearing on the motion to recuse Judge Platt. At the hearing, defense counsel conceded that the motion to recuse Judge Platt was moot because Judge Delucchi had been assigned to the case, but defense counsel noted that he would "object if [Judge Platt] comes back to preside over the trial and replaces Judge Delucchi." Presiding Judge Sarkisian denied the motion.

Judge Delucchi eventually declared a mistrial because the first penalty phase jury could not reach a verdict. In better health, Judge Platt returned to preside over the penalty retrial. Defendant did not renew his motion to recuse Judge Platt.

63

### b. *Analysis*

Defendant claims that the trial court prejudicially erred by denying his motions to declare a mistrial and to recuse Judge Platt. Defendant brought those motions during the first penalty phase trial, alleging that Judge Platt's health condition, the jury's knowledge of it, and defense counsel's sensitivity to it violated his constitutional rights to a fair trial and effective assistance of counsel. He now maintains that Judge Platt's presence prejudiced him during both the penalty phase trials. We separately address his claims as to each trial.

With respect to the first penalty trial, defendant's claims are moot. A claim is moot when the grounds for the claim no longer exist. (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 21, p. 86; see *Eye Dog Foundation v. State Bd. of Guide Dogs for Blind* (1967) 67 Cal.2d 536, 541.) As defendant conceded at the hearing, Presiding Judge Sarkisian correctly denied his motion to recuse Judge Platt because, at the time that it was before the court, Judge Platt was no longer supervising the trial. Similarly, even if defendant would have been entitled to a mistrial had the first penalty trial resulted in a sentence of death, that trial was ultimately inconclusive, and a mistrial was declared. In essence, defendant had already obtained the relief to which he would have been entitled if his motion for a mistrial had been successful. His challenge to the trial court's ruling on his motion for a mistrial is therefore moot.

With respect to the penalty retrial, defendant has failed to preserve his claim that Judge Platt should have been recused. "If a judge refuses or fails to disqualify herself, a party may seek the judge's disqualification. The party must do so, however, 'at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification.' " (*People v. Scott* (1997) 15 Cal.4th 1188, 1207; see § 1180.) At a hearing with Judge Van Oss on October 12, 1999, counsel for defendant was notified that Judge Platt would be reassigned to the

64

second penalty trial following his recovery.  At that hearing the trial court set a deadline of October 22, 1999, for any motions for Judge Platt's recusal pursuant to Code of Civil Procedure section 170.6.  This hearing and the announced deadline put defendant on notice that Judge Platt would be reassigned and that he should raise any objections to that reappointment promptly.  Defendant failed to bring a motion to recuse Judge Platt from supervising the penalty retrial.  Accordingly, he has forfeited this claim on appeal.

### 10. *Juror misconduct*

Defendant contends that there was juror misconduct in his penalty retrial and that the trial court erred in denying his motion for a new trial without an evidentiary hearing on the alleged juror misconduct.  According to defendant, the alleged misconduct and the trial court's deficient means of addressing it deprived him of the constitutional right to an impartial and unbiased jury, to due process of law, to a fair trial, to a reliable and individualized determination of punishment based on material facts and evidence adduced at trial, and to freedom from cruel and unusual punishment.

#### a.  *Background*

As explained more fully below (*post*, at pp. 107–109), Juror No. 7's wife overheard certain conversations between the prosecutor and the family of victim Besun Yu during trial proceedings, and Juror No. 7 admitted that he and his wife had had a brief conversation about the trial.  Juror No. 7's wife also conversed with a juror in the first penalty trial who had come to watch the proceedings in the penalty retrial.  During that brief conversation, the juror from the first penalty trial explained to Juror No. 7's wife that the questioning of Quigel was lengthy because the defense had to lay a foundation for his testimony.  Defense investigator Michael Kale recalled the conversation differently.  He said he overheard the juror

65

from the first penalty trial say to Juror No. 7's wife that "someone couldn't be swayed." When the trial court interviewed Juror No. 7's wife, she testified that the juror from the first penalty trial had "made a comment that there were a couple of women on the trial or on the jury, the first trial, that she thought had discussed their take of it with Mr. Fox [defense counsel]. [¶] . . . . [¶] . . . and how he might use that information to change this trial. I don't know where she was going with it, but that was my interpretation of it." Speaking to the defense counsel, Juror No. 7's wife said that she could surmise that defense counsel was not one of the previous juror's "favorite people." Defense counsel moved for a mistrial on the basis of these facts.

After the trial court denied the defense's motion for a mistrial, defense counsel moved to have Juror No. 7 removed from the jury. Defense counsel argued that there was a substantial likelihood that Juror No. 7's wife, who had extraneous information from conversations she overheard in the courtroom, would taint Juror No. 7's deliberations. The trial court denied the motion, finding that "nothing has been communicated to [Juror No. 7]."

After the jury returned a verdict, defense moved for a new trial on the grounds that Juror No. 7 had refused to deliberate and several other jurors had discussed extraneous matters during deliberations, including the jurors' personal experiences with drugs and whether defendant would actually be executed if he received the death penalty. Six jurors' statements taken by a defense investigator supported the motion. Three statements were sworn and signed by the jurors. The prosecution filed a written opposition.

According to a signed statement from Juror No. 1, Juror No. 7 "was angry from the beginning," "discussed that his wife had been questioned in court and that it would not be a good idea to bring family members to view the proceedings," and "said that he would never vote for life." Juror No. 1 reported

66

that another juror "discussed his own drug use and drug use of his family members and strongly maintained that drugs were not a mitigating factor in this case." Further, "[t]here [was] some discussion about what actually would happen to Louis Peoples if he were sentenced to death. [Another juror] explained to the jurors that Louis would actually be much safer if he were on death row than if he were in the general prison population, since he would get his own cell and he would be protected. [That same juror] also believed the death penalty would be abolished in years to come and Louis would never be executed."

According to a signed statement from Juror No. 3, the jurors "talked about drugs a lot," including several of the jurors' personal experiences with drugs. Juror No. 3 also mentioned that Juror No. 7 was very angry on account of his wife's interactions with the trial court. According to Juror No. 5's signed statement, the jurors believed that defendant would never be executed, and they discussed other states that were abolishing the death penalty and the fact that California was likely not far behind.

Defense investigator Karen Fleming's report of her interviews with three other jurors corroborated the assertions in the three signed statements that the jurors had spoken about their personal experiences with drug use and the future of the death penalty in California.

The trial court denied the defense motion for a new trial. The court noted that three of the statements supporting the motion were unsworn but nonetheless considered all six statements. The court concluded that it could not find that Juror No. 7 had refused to deliberate. Instead, Juror No. 7 "had a position about the penalty based upon the evidence, as far as the court can see." Regarding the jurors' discussions about the future of the death penalty and their personal experiences with drugs, the trial court found "an insufficient basis [to conclude] . . . that it impacted or affected their decisionmaking process."

67

### b. *Refusal to remove Juror No. 7 and denial of motion for new trial*

Defendant contends that the trial court erred in refusing to remove Juror No. 7 and in denying his motion for a new trial on the ground that Juror No. 7 refused to deliberate. "[W]here a verdict is attacked for juror taint, the focus is on whether there is any *overt* event or circumstance . . . which suggests a *likelihood* that one or more members of the jury were influenced by improper bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) "On appeal, the determination whether jury misconduct was prejudicial presents a mixed question of law and fact ' "subject to an appellate court's independent determination." ' [Citation.] We accept the trial court's factual findings and credibility determinations if supported by substantial evidence." (*People v. Tafoya* (2007) 42 Cal.4th 147, 192.)

After receiving information indicating that Juror No. 7's wife may have been exposed to the prosecutor's conversations with the Yu family, the trial court interviewed several witnesses. On the basis of these interviews, the trial court found that Juror No. 7 had not been exposed to the information. This finding was supported by substantial evidence. Accordingly, defendant's claim concerning the trial court's decision not to remove Juror No. 7 must be rejected.

Nor did the trial court abuse its discretion in denying defendant's postverdict motion for a new trial on the basis of juror misconduct. Although the postverdict interviews with several jurors suggest that Juror No. 7 was unhappy that his wife was interrogated by the trial court, they do not show that Juror No. 7 had failed to deliberate. One of the other jurors interviewed explained that Juror No. 7's opinion on the appropriate penalty was formed on the basis of the "planning and execution style of the killings." The trial court reasonably concluded that the interview statements were consistent with the possibility that

68

Juror No. 7 simply had a strong opinion about the appropriate penalty based on the evidence.

### c. Extraneous material

The trial court did not abuse its discretion in declining to order an evidentiary hearing concerning the jurors' alleged discussions about their personal experiences with drugs and the future of the death penalty. "The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Citation.] Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*People v. Avila* (2006) 38 Cal.4th 491, 604.) "The trial court's decision whether to conduct an evidentiary hearing on the issue of juror misconduct will be reversed only if the defendant can demonstrate an abuse of discretion." (*People v. Dykes* (2009) 46 Cal.4th 731, 810.)

To the extent that the jurors' statements concerned how they were affected by what other jurors said about their personal experiences with drugs or the future of the death penalty, they are inadmissible under Evidence Code section 1150, subdivision (a), as indications of juror mental processes. To the extent that defendant alleges juror misconduct on the grounds that both topics were

69

mentioned, we have previously held that discussion of this sort, grounded in the common knowledge or experience of laypersons, is "an inevitable feature of the jury system" (*People v. Dykes*, *supra*, 46 Cal.4th at p. 812). Specifically, we have held that statements of jurors regarding their estimation of the probability of an execution "come within the ambit of 'knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience,' which jurors necessarily bring to their deliberations." (*People v. Cox* (1991) 53 Cal.3d 618, 696, quoting *People v. Marshall* (1990) 50 Cal.3d 907, 950.) As to juror discussion of their personal experiences with drugs, we held in *People v. Yeoman* (2003) 31 Cal.4th 93, 162 that, "while certainly a proper subject of expert testimony, [this subject] has become a subject of common knowledge among laypersons" and "' [j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.' [Citation.]"

### 11. *Supervision of jury deliberations*

Defendant contends that, in several respects, the trial court's supervision of jury deliberations in the penalty retrial coerced a death verdict in violation of his state and federal constitutional rights to due process, to a fair trial, to present a defense, to confrontation, to a reliable and individualized sentencing determination, and to freedom from cruel and unusual punishment.

#### a. *Background*

The jury for the penalty retrial began deliberating on May 17, 2000. On May 30, 2000, after approximately 20 hours of deliberation, the jury foreperson informed Judge Platt that the jury had reached an impasse and requested "further instructions." Rather than poll the jury to determine whether there was a reasonable probability of reaching a verdict, the trial court inquired as to the number of ballots the jury had taken and the allocation of votes at each ballot. The

70

foreperson reported that the jury had taken six ballots. The first ballot was six and two, with four undecided. The second ballot was eight and two, with two undecided. The third ballot was seven and three, with two undecided. The fourth ballot was eight and two, with two undecided. The fifth ballot was nine and two, with one undecided. The last ballot was nine and three.

After learning this information, the trial court advised the jury: "I've calculated up the amount of time that you've actually been in discussions, whether it's been voting, or whether — the time you've actually been in the deliberation room going about your discussions. And it totaled about 20 hours of time that you've actually been in there during discussions. [¶] So over the days since the 17th of May, it has been about 20 hours of actual discussion time. Okay? [¶] Now, when one is in the room and doing the discussions, I'm sure that that appears to be a considerable amount of time. [¶] We have come a very long way. And the issues that you are talking about are literally life and death issues. And the only instruction I can give you at this point in time is 20 hours of discussion does not amount to an impasse that we cannot justify going further and having further discussion. [¶] At what point in time that is or is not the case, I don't know. But I think you owe it to yourselves to continue to talk about the matter and see if there is further discussion. See if there is any change in any fashion. Before we decide whether or not we are truly at an impasse. [¶] So my instruction to you at this point in time is, as I said this morning — I didn't choose those words lightly — it's time again to roll up your sleeves and go back to work."

At the end of the day, the court further advised the jury: "I'm going to reread four of the instructions that have previously been read to you. There is no greater or less significance to those instructions. They merely are applicable to the issue of how you go about or continue about your deliberations. Other than that, they have no greater or less importance. [¶] And because the law says that I have

71

to be very careful about what position the court takes, I want to start off with the instruction that says I have not intended by anything that I have said or done, or by any question that I may have asked, or by any ruling that I may have made, to intimate or suggest what you should find the facts to be, or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusions. [¶] The reason I wanted to start with that is by telling you that there is a lot of deliberation left to be had doesn't mean that you need to or should move or change your positions. That is entirely up to you as individuals. [¶] But my job and my function is to keep things moving as long as I think they can still move. So I have to be very delicate in the way I go about doing that. [¶] I want you to continue deliberating. I want you to continue discussing until I have to decide that there is or is not the ability to reach a verdict. Okay? So it's a very touchy issue. [¶] And I don't want you to misperceive what the court's position is. I have no position other than to move you along until and if you can reach a verdict. [¶] . . . [¶] The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict, if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. [¶] Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of jurors or any of them favor that decision. [¶] . . . [¶] The attitude and conduct of jurors at all times are very important. It is rarely helpful for a juror at the beginning of deliberation to express an emphatic opinion on the case, or to announce a determination to stand for a certain verdict. [¶] When one does that at the outset, a sense of pride may be aroused; and one may hesitate to change a position, even if shown it is wrong. [¶] Remember that you are not partisans nor advocates in this matter. You are the impartial judges of

72

the facts.  [¶] That's the extent of the instructions that I wanted to reread to you at this point in time.  [¶] And I think I made a comment to counsel at one point after you folks had left that the 20 hours or so — now 21 hours, 21 and a half hours — that you've spent at this point in time with the issues that you are dealing with is a drop in the bucket.  [¶] And until I decide that further deliberations are of no avail, then I'll have you continue to roll up your sleeves and go to work as best you can.  [¶] One of the ways that I would suggest you do it — and it is merely a suggestion.  Because obviously now there have been some positions taken.  During the discussions that you have in the next few days, if you take the other side's position, advocate it as if it were yours, see whether or not that changes your own thoughts about your position.  [¶] Discuss it again with the other jurors.  Do that talking, do that deliberating.  And then we'll see where we are."

At the end of the next day, May 31, 2000, the jury sent the trial court a note indicating that the jury planned to adjourn at 12:30 p.m. on June 1 and not to deliberate on June 2.  Juror No. 5 also communicated to the court that he or she had planned to drive his or her daughter's eighth grade class on a trip to Yosemite from June 7 to June 9.  The trial court brought the jury back and said, "I don't have a problem with the [proposed deliberation schedule]."  The court then discussed the class trip with Juror No. 5:

"THE COURT:  . . . . The more difficult issue, [Juror No. 5], is June 7th, 8th and 9th.  It's for your daughter's school trip?  Going to where?

"[Juror No. 5]:  Yosemite.

"THE COURT:  And without you going along, what does that do?  Your note says that another parent has already backed out.  That puts them in difficult straits.

"[Juror No.5]:  Well, I'm a driver.  I'll drive kids and chaperone.

73

"THE COURT: What I need you to try to do is see if they can rustle somebody else up to do that driving. Okay? 'Cause if you can do that today when you get home, then we'll know tomorrow. Try and give them enough lead time. [¶] If not, then I'll have to take a look tomorrow and see what discussions are being had, where you folks are. If there's momentum going in the discussion, I don't want to take the time off. If perhaps it's better to take the time off and take a breather, we can do that. [¶] So I can't tell you yes or no right now. Obviously, we're getting to some very critical stages. And I've got to try and balance everybody's interest. Yours as well as the rest of the folks. [¶] So I will try to do what I can do. But if you can find whether or not they can take care of that with somebody else — [¶] Friday obviously isn't a problem, 'cause we're not going on Friday. Just the 7th and 8th that I've got problems with. [¶] But see whether or not it can be addressed first. And if not, then I'll see what can be done. All right?"

On the morning of June 1, 2000, the jury requested access to certain demonstratives that the prosecutor used during closing argument but that were not in evidence. Together, the demonstratives formed a timeline of the events underlying the crimes for which defendant was convicted.

Defense counsel objected to allowing the jury to access the demonstratives because they were not in evidence. Nonetheless, the trial court allowed the jury access. The court admonished the jury that the exhibits were not in evidence and that they could only be used to aid in discussions of and deliberations on the evidence. The court also indicated that the jury could view other exhibits if they so requested. Before sending the demonstratives to the jury, the court marked them as court's exhibits OOOO, PPPP, and QQQQ.

A short time later, the jury requested access to certain demonstratives that defense counsel used during his closing argument. After some discussion between

74

trial counsel and the court to determine which demonstratives the jury wished to see, the court eventually allowed the jury to access four demonstratives. The first demonstrative, which was marked RRRR, provided defense counsel's definition of a "mitigating circumstance." The other three demonstratives, marked court's exhibits SSSS, TTTT, and UUUU, together formed a list of 22 examples of mitigating circumstances. The court complied with the jury's request but admonished the jury that the exhibits contained defense counsel's interpretation of the law.

Shortly thereafter, the jury requested access to another demonstrative used during defense counsel's closing argument. This demonstrative was a poster board offering the defense's interpretation of a capital jury's task during the penalty phase. The demonstrative stated: "**MUST** VOTE LIFE IF MITIGATION OUTWEIGHS AGGRAVATION [¶] **MUST** VOTE LIFE IS [*sic*] MITIGATION AND AGGRAVATION ARE EQUAL [¶] **MUST** VOTE LIFE IF AGGRAVATION OUTWEIGHS MITIGATION, BUT NOT SUBSTANTIALLY [¶] **MUST** VOTE LIFE IF AGGRAVATION SUBSTANTIALLY OUTWEIGHS MITIGATION, BUT YOU BELIEVE DEATH IS NOT APPROPRIATE [¶] **MAY** VOTE DEATH IF AGGRAVATION SUBSTANTIALLY OUTWEIGHS MITIGATION AND YOU BELIEVE DEATH IS APPROPRIATE." This demonstrative was marked as court's exhibit VVVV.

The court refused to allow the jury access to this demonstrative during deliberations. The court explained that exhibit VVVV was different from exhibits OOOO–UUUU because it was a "comment about the ultimate issue [the jurors] are to do. That is their ultimate responsibility in casting a vote."

In the middle of the day on June 1, 2000, the trial court returned to Juror No. 5's request to take time off from June 7 to June 9:

75

"THE COURT: Before I send you home for the weekend, we need to, [Juror No. 5], did you get an answer to —

"[Juror No. 5]: Well, my daughter's teacher told me that he really needs me.

"THE COURT: With emphasis added, I take it.

"[Juror No. 5]: Right. And that he wants me to call him ASAP as soon as I have some indication from you.

"THE COURT: All right. Has it been discussed with the rest of the jurors about what that does?

"[Juror No. 5]: Well, they know about it.

"THE COURT: Okay. I want to ask you one more time to exercise. Go back, discuss whether to take those three days off. So we'll have Monday next week at one, and then Tuesday and Wednesday. [¶] Is it Wednesday, Thursday, and Friday? So we'd go Monday, Tuesday of next week. We take the 7th, 8th and 9th off. Then we'd come back the 12th. [¶] Why don't you go back, talk about that, see if that really sets anybody's plans askew. [¶] I know we talked about the end of June. That still gives us a lot of time for you to be able to deliberate or talk about it. [¶] Go back and think about that for a moment and come back and let me know, [Juror No. 5], if you would, what the consensus or the agreement is. Then I'll make a decision. [¶] We've got to let the folks know for their purpose. It's an important trip to the kids. If we can work around it, I said I'll try to work around it. [¶] So why don't you folks talk about it for a moment." After a short break, the foreperson informed the trial court what the jury had decided: "We discussed it. We are going to take those days off, and we are going to have a — we have committed ourselves to a concentrated effort thereafter."

On June 6, 2000, the jury returned a verdict of death.

### b.    Failure to poll the jury

According to defendant, the court had "a duty to determine whether there [was] a 'reasonable probability' further deliberations would prove useful in resolving differences, and the means to do so is by inquiry of the jurors themselves." We review a trial court's "determination whether there is a reasonable probability of agreement" for an abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 363; see § 1140.) "While the trial court has a duty to avoid coercing the jury to reach a verdict, . . . inquiry as to the possibility of agreement is 'not a prerequisite to denial of a motion for mistrial.' " (*People v. Bell* (2007) 40 Cal.4th 582, 616–617.) Thus, a trial court does not abuse its discretion merely by declining to poll the jury as to the likelihood of reaching a unanimous verdict.

Further, the trial court's inquiry was reasonable under the circumstances. In *People v. Proctor* (1992) 4 Cal.4th 499, 538, the jury informed the trial court that they had reached an impasse in their deliberations and asked for further instructions. The trial court asked the foreperson for the allocation of the jurors' votes. We approved that procedure, determining that it was conducted for the purpose of determining whether further deliberations would be fruitful. (*Id.* at p. 539.) Here, each successive ballot showed changes in the jurors' individual determinations, suggesting that the jury had not reached an insurmountable impasse. Under these circumstances, the trial court conducted a reasonable inquiry into whether it was reasonably probable that further deliberations would be productive. Thus, the trial court did not abuse its discretion in declining to poll the jury as to the probability of reaching a verdict.

### c.    Statements to the jury during deliberations

Defendant contends that the trial court's statements to the jury during deliberations coerced the jury to reach a death verdict. In particular, defendant maintains that the trial court's statement that 21.5 hours of deliberation was a

77

"drop in the bucket" and the observation that deliberations could potentially continue until the end of the month of June led the jury to believe that they had to render a verdict. Defendant also objects to the court's suggestion to the jury that they "take the other side's position, advocate it as if it were yours, see whether or not that changes your own thoughts about your position."

Coercion occurs where "the trial court, by insisting on further deliberations, expresse[s] an opinion that a verdict should be reached." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 775.) " 'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived " 'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.' " ' " (*People v. Debose* (2014) 59 Cal.4th 177, 209.)

The trial court's statements to the jury, given the totality of the circumstances, were not coercive. Although the trial court's statement that 21.5 hours of deliberation was a "drop in the bucket," when read in isolation, could be construed as an inducement to reach a verdict, the trial court's complete remarks do not suggest that the court crossed the line from encouragement to coercion. Similarly, the trial court's passing remark that deliberations could continue until the end of the month was not unreasonable given that the court had previously informed jurors that their service could be required until the end of June. Further, the trial court permitted the jury flexibility over the schedule of their deliberations. The record shows that the trial court was willing to accommodate a wide range of personal commitments on the part of the jury. For example, after learning that

78

Juror No. 5 could not find a replacement driver for his or her child's three-day class trip, the court planned to allow the jury to recess for three days.

Finally, defendant contends that the trial court's suggestion to the jury that they reverse role-play violates our decision in *People v. Gainer* (1977) 19 Cal.3d 835, disapproved on another ground in *People v. Valdez* (2012) 55 Cal.4th 82, 163. In *Gainer*, we held that "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Id.* at p. 852.) The lower courts that have addressed the kind of instruction that the trial court gave here have determined that it does not violate *Gainer*. (*People v. Whaley* (2007) 152 Cal.App.4th 968, 983.) As the court in *Whaley* concluded, several features distinguish a case like this one from *Gainer*. First, the trial court's suggestion that the jurors reverse role-play did not require the jurors to consider their minority status on the jury. Second, the court instructed the jury with CALJIC No. 17.40, emphasizing that the jurors were to use their independent judgment and come to their own individualized determinations. Third, the court suggested, but did not order, the jurors to engage in the reverse role-playing exercise. Under the circumstances, the instruction did not "direct[] the jury that it was required to reach a verdict, place[] any constraints on an individual juror's responsibility to weigh and consider the evidence, or coerce[] the jurors into abdicating their independent judgment in favor of compromise and expediency." (*Whaley*, at p. 982.)

### d. *Jury's access to certain prosecution and defense exhibits*

Defendant contends that the trial court improperly permitted the jury to review certain demonstratives used during the prosecutor's closing argument and

improperly prohibited the jury from reviewing certain demonstratives used during defense counsel's closing argument. "[A] trial court's inherent authority regarding the performance of its functions includes the power to order argument by counsel to be reread to the jury or to be furnished to that body in written form. The exercise of such power must be entrusted to the court's sound discretion." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1260, overruled on another ground in *People v. Edwards*, *supra*, 54 Cal.3d at p. 835.)

The trial court allowed the jury, at the jury's request, to view three posters used during the prosecutor's closing argument, which provided the timeline of defendant's crimes, and four posters used during defense counsel's closing argument, which offered defense counsel's definition and examples of a mitigating circumstance. It does not appear that the trial court was stacking the deck against the defense. The trial court provided the jury with the exhibits they requested from both the prosecution and the defense. Regarding exhibit no. VVVV, the trial court determined that this exhibit, unlike the others, too closely addressed the jury's ultimate task in the penalty phase. The trial court also excluded two defense posters that were not responsive to the jury's requests. On these facts, we cannot say that the trial court's decisions were an abuse of discretion.

### e.   *Denial of motion for mistrial*

At trial, defendant brought a motion for a mistrial on the ground that the trial court coerced the death verdict. The trial court denied the motion. Defendant now claims that the trial court erred. We review this claim for an abuse of discretion. (*People v. Gonzales*, *supra*, 52 Cal.4th at p. 314.) Because we do not find that the trial court erred in its supervision of the jury's deliberations, this claim must be denied.

80

### D. Judicial Misconduct Claims

As an initial matter, defendant has requested that we take judicial notice of the decision of the Commission on Judicial Performance removing Judge Platt from judicial office two years after the completion of defendant's trial (*Inquiry Concerning Platt* (2002) 48 Cal.4th CJP Supp. 227) as well as Judge Platt's temporary suspension from the practice of law for the same underlying incidents. We deny this request as the circumstances giving rise to Judge Platt's removal from the bench and subsequent suspension are irrelevant to the proceedings against defendant.

#### 1. Ex parte communications

##### a. Background

Judge Michael Platt presided over defendant's guilt phase trial, part of his first penalty phase trial, and his second penalty phase trial. Before the guilt phase, defendant moved to disqualify Judge Platt. Code of Civil Procedure section 170.1, former subdivision (a)(6)(C) (now subd. (a)(6)(A)(iii)) requires a judge to be disqualified where "[f]or any reason: [¶] . . . [¶] A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." In his motion, defendant alleged that Judge Platt had engaged in ex parte communications on three occasions, and these communications showed that Judge Platt could not be impartial. First, Judge Platt asked Lester Fleming, the District Attorney's homicide unit supervisor, whether he intended to oppose defendant's motion to change venue. Fleming indicated that the District Attorney would oppose the motion. Second, Judge Platt answered defense funding request supervisor Judge Demetras's question as to whether the District Attorney would oppose the venue motion. Finally, Judge Platt spoke with counsel for defendant's wife, Carol Peoples, when the latter approached the bench to disclose Mrs. Peoples's intention to invoke the spousal privilege against testifying.

San Joaquin County Counsel filed an answer to the motion, and Judge Platt and Deputy District Attorney Fleming filed supporting declarations. In Judge Platt's declaration, he acknowledged all three ex parte conversations, but denied any bias against defendant. Defendant responded with a supplemental declaration, which asked the court to take judicial notice of a case where Judge Demetras was recused for ex parte communications with Judge Platt, who at the time was a prosecutor. Defense investigator Michael Kale also filed a declaration detailing his interviews with Deputy District Attorney Fleming and Carol Peoples's attorney.

Applying the "objective person" standard, Judge Duane Martin determined that an average person would view Judge Platt's conversation with Carol Peoples's attorney as the judge's attempt to avoid procedural obstacles arising from the case's publicity, while doing his best to avoid communicating about the merits of the case. Judge Martin opined that Judge Demetras's question to Judge Platt whether the district attorney planned to oppose a venue change was "just one of th[o]se remarks that people will make." Finally, Judge Martin emphasized that Judge Platt's exchange with Deputy District Attorney Fleming was made in public and concluded that Judge Platt's question whether Fleming would oppose a venue change was merely the judge innocuously trying to plan for future hearing dates. After finding no reasonable doubt of impartiality, Judge Martin denied the motion.

### b. Analysis

Defendant claims Judge Martin erred when he denied the motion to disqualify Judge Platt, depriving him of his state and federal constitutional due process rights to be tried by a fair and impartial judge.

To the extent that defendant's claim is that his statutory rights under Code of Civil Procedure section 170.1 were violated, he has failed to preserve it. An

82

order denying a motion to disqualify a judge is "not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding. The petition for the writ shall be filed and served within 10 days after service of written notice of entry of the court's order determining the question of disqualification." (Code Civ. Proc., § 170.3, subd. (d).) In *People v. Panah*, *supra*, 35 Cal.4th 395, 444, we observed that the statute "means what it says . . . [and] provides the exclusive means for seeking review of a ruling on a challenge to a judge, whether the challenge is for cause or peremptory." Since defendant failed to file a petition for a writ of mandate, he has forfeited his claim on appeal.

But we may review defendant's claim to the extent that it concerns his state and federal constitutional rights to due process. (*People v. Chatman* (2006) 38 Cal.4th 344, 362–363.) Under state and federal law, a defendant has a due process right to an impartial trial judge. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309; *People v. Brown* (1993) 6 Cal.4th 322, 332.) "[S]ection 170.3(d) does not apply to, and hence does not bar, review (on appeal from a final judgment) of *nonstatutory* claims that a final judgment is constitutionally invalid because of judicial bias." (*Brown*, at p. 335.)

"[T]he [federal] due process clause operates more narrowly" than Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii) and justifies judicial disqualification only under the " 'most "extreme facts." ' " (*People v. Cowan*, *supra*, 50 Cal.4th at pp. 456–457, citing *Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868, 877, 886–887.) To establish a federal due process violation, " 'there must exist " 'the probability of actual bias on the part of the judge.' " ' " (*Cowan*, at p. 456.)

Defendant's arguments concerning Judge Platt's ex parte communications fail to demonstrate a substantial probability of actual bias on the part of Judge

Platt. Judge Martin's review of the disqualification motion is consistent with our rulings on ex parte communications involving judges. For example, in *People v. Mendoza* (2000) 24 Cal.4th 130, we concluded that an ex parte meeting between a judge and a prosecutor on the question of jury misconduct did not establish judicial bias. (*Id.* at pp. 196–197.) We came to the same conclusion in *People v. Brown*, *supra*, 6 Cal.4th 322, in which a judge informed the defense ex parte that efforts to contact jurors after the verdict would not affect a hearing to modify a death verdict. (*Id.* at pp. 328–329, 336–337.) Accordingly, we reject defendant's claims that his due process rights were violated by Judge Platt's ex parte communications.

### 2. Judicial bias

Defendant contends that Judge Platt was biased and that he committed numerous instances of judicial misconduct in violation of defendant's constitutional rights to an impartial adjudicator, a fair trial, effective assistance of counsel, and his right to be free from cruel and unusual punishment. Defendant further contends that Judge Platt, due to his alleged bias, was without jurisdiction to impose the death penalty.

"A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge." (*People v. Cowan*, *supra*, 50 Cal.4th at p. 455; see *Arizona v. Fulminante*, *supra*, 499 U.S. at p. 309; *People v. Brown*, *supra*, 6 Cal.4th at p. 332.) "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' " (*People v. Freeman* (2010) 47 Cal.4th 993, 996,

84

quoting *Caperton v. A.T. Massey Coal Co.*, *supra*, 556 U.S. at p. 877.) The high court has emphasized that only the most "extreme facts" justify judicial disqualification based on the due process clause. (*Caperton*, *supra*, at pp. 887–888.) The high court in *Caperton*, for example, held that a justice on the West Virginia Supreme Court of Appeal violated the defendant's due process rights by not recusing himself when the president of the defendant corporation, which had lost at trial, had donated $3 million to the justice's election campaign at a time when it was likely that the corporation would seek review in that court. (*Id.* at pp. 886–887.)

Defendant claims Judge Platt showed his bias in several ways. First, defendant says Judge Platt skewed the case against the defense by making erroneous rulings in the prosecution's favor, including denying defendant's motions for continuances, excluding evidence of defendant's remorse, limiting the scope of defense counsel's cross-examination of prosecution expert Dr. Mayberg, and admonishing the jury that one of defense counsel's questions was improper.

Second, defendant says Judge Platt refused to control numerous instances of prosecutorial misconduct, refused to allow defense counsel to object on the ground of prosecutorial misconduct in front of the jury, and "transfer[red]" blame for the prosecutor's misconduct to defense counsel.

Third, outside the jury's presence, Judge Platt used colorful and sometimes vulgar and disrespectful language to communicate with defense counsel. For example, in discussing the schedule on which trial counsel would be expected to prepare proposed jury instructions for the guilt phase, Judge Platt remarked, "I specifically and without equivocation ordered counsel to be available for this case and this case only. And I don't care if it meant not eating, not sleeping, not taking a shit, it absolutely was to have been focused on this case for the entire timeframe from the moment I made that order until the conclusion of the trial." On another

occasion, regarding a proposed modification to the penalty instructions that would have further explained the meaning of mitigation factors, Judge Platt said, "To argue it so that [the jurors] are so god damned stupid that they cannot understand simple terminology. [¶] And I find offense to that. And assign no significant weight in argument to it. [¶] . . . [¶] I have said it before, and I will say it again. If our system is so flawed because humans have their heads so far up their ass that they cannot understand the issues at hand in this case or these cases, then we should eliminate the jury system as a whole. [¶] Enough said on the issue. And nothing more will be commented on in that regards." On other occasions, defense counsel took issue with Judge Platt's demeanor in extended colloquies outside the presence of the jury.

We have held that the trial court did not erroneously deny defendant's motions for continuances (*ante*, at pp. 30–31), exclude evidence of defendant's remorse (*ante*, at pp. 37–44), limit the scope of defense counsel's cross-examination of prosecution expert Dr. Mayberg (*ante*, at pp. 49–54), or admonish the jury that one of defense counsel's questions was improper (*ante*, at pp. 54–56). Accordingly, these claims are not grounds for finding that Judge Platt was biased against the defense.

To the extent that defendant's contention is that Judge Platt showed favoritism toward the prosecutor, sometimes even "transferring" blame for his misdeeds to defense counsel, the claim is belied by the record. Indeed, the record shows many instances in which Judge Platt rebuked the prosecutor, George Dunlap, for his strategy and demeanor.

Defendant's assertion that Judge Platt spoke to defense counsel in an abusive fashion fails to establish judicial bias. Defendant is correct that Judge Platt frequently spoke discourteously and disrespectfully to defense counsel throughout trial. There are numerous examples in the record of Judge Platt

86

violating canon 3B(4) of the California Code of Judicial Ethics, which says, "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers and of all staff and court personnel under the judge's direction and control."

Despite Judge Platt's failure to comport himself in the manner required by our Code of Judicial Ethics, his misconduct was limited to hearings outside the presence of the jury and thus did not result in a probability of actual bias. We review claims of judicial misconduct on the basis of the entire record. "A 'trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution.' [Citations.] Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. [Citation.] When 'the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233.)

The facts on which defendant relies do not suggest that Judge Platt unduly influenced the jury. Defendant fails to offer evidence that Judge Platt's discourteous or improper remarks influenced the jury or otherwise affected the trial. As noted, all of defendant's examples of inappropriate behavior took place outside the presence of the jury. Although Judge Platt's behavior outside the jury's presence may provide context for his behavior in the jury's presence, defendant offers no compelling examples of prejudicial behavior in front of the jury.

Defendant maintains that the cold record before us does not fully reflect Judge Platt's bias, in large part because Judge Platt denied defendant's motion to videotape the proceedings. But the trial court has discretion to decide whether to allow the proceedings to be recorded. And the trial court exercised that discretion fairly, as the court also denied the prosecution's motion to videotape the proceedings to show defendant's "jocularity" in the courtroom.

### 3. *Jurisdiction to impose the death penalty*

Defendant makes a twofold argument that Judge Platt was without jurisdiction to impose the death penalty. First, according to defendant, Judge Platt's partiality prevented him from making an independent determination of the weight of the evidence in evaluating the propriety of the death penalty under section 190.4, subdivision (e). Because defendant has not shown that Judge Platt was biased, we reject this argument.

Second, defendant argues that the trial court lacked jurisdiction to impose the death penalty because the court was physically sitting in San Joaquin County when it imposed the death penalty. Before trial, the court transferred venue from San Joaquin County to Alameda County due to publicity concerns. Judge Platt, who sat in San Joaquin County, traveled to Alameda to preside over the trial. The guilt phase, the initial penalty phase that ended in a mistrial, and the second penalty trial were all conducted in Alameda County with jurors drawn from Alameda County. After a verdict had been rendered and the jury dismissed on June 6, 2000, in Alameda County, Judge Platt reconvened postverdict proceedings in a juvenile division courthouse in San Joaquin County on July 7, 2000. Judge Platt clarified at the outset that these proceedings were conducted under the "jurisdiction and authority" of the Alameda County Superior Court. Defendant

himself had been moved from Alameda County to San Joaquin County in the interim.

Although defendant challenges Judge Platt's "jurisdiction," he cites three provisions governing venue — sections 1033, 1033.1, and 1036 — in support of this challenge. " '[V]enue is not jurisdictional in the fundamental sense; and, both in civil and criminal cases, a change of venue from the superior court of one county to the same court in another county does not affect its jurisdiction over the subject matter of the cause.' " (*People v. Simon* (2001) 25 Cal.4th 1082, 1096.) Defendant's argument is therefore best understood as alleging that Judge Platt failed to comport with the rules governing a change of venue. Section 1033.1 is inapposite; it requires a hearing where a defendant's conviction has been overturned on appeal and the case is returned to the trial court, which did not occur here. Section 1036 is also inapposite, as it concerns *pretrial* custody of a defendant where there is a change of venue. Section 1033 provides: "In a criminal action pending in the superior court, the court shall order a change of venue: [¶] (a) On motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county. When a change of venue is ordered by the superior court, it shall be for the *trial itself*. All proceedings before trial shall occur in the county of original venue, except when it is evident that a particular proceeding must be heard by the judge who is to preside over the trial. . . ." (Italics added.) Section 1033 states that pretrial proceedings may take place in the county of original venue but does not address posttrial proceedings. Section 1038 provides that "[t]he Judicial Council shall adopt rules of practice and procedure for the change of venue in criminal actions."

Before physically relocating proceedings to San Joaquin County and imposing the death sentence, the trial court consulted with the Judicial Council to

89

determine whether posttrial proceedings could take place in San Joaquin County. The Judicial Council advised the trial court that regardless of where it sat, it would still operate under the jurisdiction of Alameda County. Since defendant's trial and conviction, the Judicial Council has revised the California Rules of Court to require "postverdict proceedings, including sentencing" to "be heard in the transferring court." (Cal. Rules of Court, Rule 4.150(b)(3).)

Judge Platt's decision to physically move postverdict proceedings to San Joaquin County was proper. Section 1033 explicitly addresses only pretrial proceedings and does not specify when "the trial itself" has concluded. The change of venue statutory scheme delegates authority to the Judicial Council to resolve any such ambiguities. Judge Platt duly consulted with the council, which has since promulgated a mandatory rule consistent with its advice here. Judge Platt's decision is also consistent with the underlying policies of the venue statutes. The concerns with jury bias that had led the court to relocate proceedings to Alameda County were no longer applicable once the jury had returned a penalty verdict and had been excused. Finally, defendant does not allege he was prejudiced by the decision to move postverdict proceedings back to San Joaquin County. (See *People v. Vieira* (2005) 35 Cal.4th 264, 279 [defendant need not show actual prejudice on appeal after judgment challenging a failure to change venue but must show a "reasonable likelihood" that a fair trial was not had].)

### E. Prosecutorial Misconduct

Defendant claims that in both phases of the trial, the prosecutor, George Dunlap, committed numerous instances of misconduct in violation of defendant's state and federal constitutional rights to a reliable determination of guilt, death eligibility, and sentence, as well as his rights to present a defense, to confront witnesses, and to be free from cruel and unusual punishment.

90

"Prosecutors . . . are held to an elevated standard of conduct. 'It is the duty of every member of the bar to "maintain the respect due to the courts" and to "abstain from all offensive personality." [Citation.] A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation.] As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." [Citation.] Prosecutors who engage in rude or intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve.' " (*People v. Hill* (1998) 17 Cal.4th 800, 819–820.) " ' " " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*Hill*, at p. 819.) We review the trial court's rulings on prosecutorial misconduct for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

Defendant has requested we take judicial notice of the disciplinary records of the prosecutor, George Dunlap, who has been suspended twice by the California State Bar. We deny this request as the circumstances giving rise to the disciplinary proceedings against Mr. Dunlap are irrelevant to the proceedings against defendant.

### 1. *Improper language and gestures*

Defendant notes that the prosecutor used improper language and made improper gestures in relation to defense counsel's representation of his client. In particular, the prosecutor repeatedly characterized defendant's arguments or the testimony of defendant's experts as "ludicrous," "ridiculous," "preposterous," "outrageous," "offensive," "shock[ing]" or "bull," and engaged in numerous "theatrics" such as slamming books, making facial expressions, laughing, throwing his hands in the air, and sighing audibly. Although some of the prosecutor's behavior was unprofessional, the facts recited above do not constitute prosecutorial misconduct. Using colorful or hyperbolic language will not generally establish prosecutorial misconduct. (*People v. Stitely* (2005) 35 Cal.4th 514, 559–560.) Neither does making overly dramatic gestures. And importantly, almost all of the occurrences cited by defendant occurred outside the presence of the jury.

### 2. *Argumentative questions*

Defendant observes that the prosecutor asked numerous argumentative questions when cross-examining defense witnesses. To list a few examples, the prosecutor asked defense expert Dr. Lisak, "how many hours are you into them for?" He said to defense expert Dr. Buchsbaum, "Let's quit guessing for awhile and look at the facts." He said to defense expert Dr. Wu, "It's a pain in the butt to get these test scores." And he asked prosecution expert Dr. Mayberg, "Did you have a heart attack last night when you looked at the raw data?" During direct examination in the penalty retrial, Dr. Wu testified that defendant's PET scans revealed abnormal functioning and that additional stress could cause "catastrophic failure" akin to "thin ice on a pond." During cross-examination, the prosecutor asked the following series of questions:

"Q. Thin ice on a pond. Do you recall that, Doctor?

92

"A.  Yes, Mr. Dunlap.

"Q.  Thin ice on a pond.

"A.  Yes.

"Q.  So what does that make James Loper?  [¶] Skating on thin ice on a pond, Dr. Wu?

"Mr. Fox:  Judge, I'll object.  That is argumentative.

"The Court:  Sustained."

This objection was properly sustained.  The prosecutor did not "seek to elicit relevant, competent testimony" (*People v. Chatman*, *supra*,38 Cal.4th at p. 384) from Dr. Wu.  This last question instead sought to apply Dr. Wu's testimony to the prosecution's theory of the case.  While improper, asking this question does not constitute prejudicial misconduct, especially where, as here, defendant's objection to it was correctly sustained at trial.  The "critical inquiry on appeal is not how many times the prosecutor erred but whether the prosecutor's errors rendered the trial fundamentally unfair or constituted reprehensible methods . . . to attempt to persuade the jury."  (*People v. Hinton* (2006) 37 Cal.4th 839, 864.)  The prosecutor's argumentative questions in this case did not meet this standard.

### 3.  *Personal attacks on defense counsel*

Defendant argues that the prosecutor personally attacked defense counsel in front of the court and in defense counsel's absence.  On October 4 and 12, 1999, defense counsel was absent from the proceedings due to a medical problem.  On October 12, second-chair defense counsel Charles Slote was also absent.  The prosecutor observed that the prosecution team and the trial court had traveled two hours to the appearance for no reason.  The trial court ordered defense counsel to

93

appear personally on October 18 or to produce a statement from his physician indicating when he would be ready to proceed.

On October 18, Slote presented a note from a county health clinic doctor stating that defense counsel would return by November 1. The prosecutor questioned whether the note was authored by a doctor or a nurse practitioner, and he observed that the note did not indicate the nature of defense counsel's ailment. The prosecutor expressed frustration with delaying the trial process further and questioned whether defense counsel was purposefully delaying. This conduct does not constitute prosecutorial misconduct. If defense counsel was seriously ill, he was certainly entitled to an absence from the trial. But the prosecutor was entitled to inquire as to the duration of defense counsel's expected absence and to probe the trial court to take action to determine that information.

### 4. Deceptive tactics

Defendant contends that the prosecutor committed misconduct by engaging in deceptive practices and ignoring trial court orders. As defendant notes, Dunlap flouted the following trial court orders (1) not to use the word "murder" or its cognates to refer to the homicides at issue in the guilt phase trial, (2) not to examine Rodney Dove regarding drug tests that he performed on other employees of Charter Way Tow, (3) not to mention a nonfunctioning shotgun found at defendant's apartment, and (4) not to display wooden mannequins representing each of the five victims when the mannequins were not being used as demonstratives. Defendant is correct that this conduct was improper.

In a close case, a prosecutor's violation of the trial court's orders in limine could have a prejudicial effect on the jury and thus could rise to the level of prejudicial misconduct. Here, however, defendant has not shown prejudice. On nearly every occasion that Dunlap violated the trial court's orders in limine, the

94

trial court sustained a defense objection to Dunlap's question. With respect to the prosecutor's question that elicited testimony regarding the shotgun, for example, the trial court emphatically and unequivocally instructed the jury that they were not to consider the shotgun in their deliberations, that it was antique and of no relevance to the case, and that it was "a violation of the court's order to have that question asked." This was sufficient to forestall any improper inferences on the part of the jury. A party is generally not prejudiced by a question to which an objection has been sustained. (*People v. Mayfield* (1997) 14 Cal.4th 668, 755, disapproved on another ground in *People v. Scott*, *supra*, 61 Cal.4th at p. 390, fn. 2.)

### 5. *Misrepresentation to the trial court*

Defendant contends that the prosecutor intentionally misrepresented the nature of a discovery violation involving Dr. Amen's data. The prosecution called Dr. Mayberg as a rebuttal expert witness during the guilt phase in response to the testimony of Drs. Wu, Amen, and Buchsbaum. In preparation for Dr. Mayberg's testimony, the prosecution requested on Dr. Mayberg's behalf discovery of the "raw data" underlying the tests of Dr. Wu and Dr. Amen. Neither the prosecutor nor defense counsel knew exactly what Dr. Mayberg meant when she requested the "raw data." But during the second day of Dr. Mayberg's testimony, it became apparent that she had not received all the information she had requested. Defense counsel believed that the information had been provided to the prosecution, but he could not produce a receipt of discovery. Eventually the defense provided the data, and the court recessed to allow Dr. Mayberg time to review it.

During cross-examination of Dr. Mayberg in the penalty retrial, defense counsel asked Dr. Mayberg how she could be willing to testify when she "didn't even have all the materials necessary to render an opinion." The prosecutor

95

objected, and the trial court held a hearing outside the jury's presence. During the hearing, the prosecutor characterized defense counsel's line of questioning as "intentional misconduct," as defense counsel intended to mislead the jury into believing it was Dr. Mayberg's fault that she did not review all of the relevant data. Regardless of whether the prosecutor correctly characterized defense counsel's questions as "intentional misconduct," the record does not suggest that the prosecutor misrepresented the nature of the discovery dispute in the guilt phase. Accordingly, we reject defendant's claim.

### 6. *Opening and closing statements*

Defendant contends that Dunlap committed prosecutorial misconduct by making improper remarks in his opening and closing statements. " '[A] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence.' " (*People v. Dykes*, *supra*, 46 Cal.4th at p. 768.) We address each of the remarks to which defendant assigns error below.

Defendant challenges certain comments that the prosecutor made in the first penalty trial. As noted, the first penalty trial was ultimately inconclusive, and a mistrial was declared. His challenge to the prosecutor's opening and closing statements in that trial, therefore, is moot.

During the prosecutor's closing argument in the guilt trial, he stated: "When you want to compare experts — Dr. Wu, Dr. Buchsbaum, Dr. Amen — you compare 'em to People's expert. Dr. Mayberg. [¶] There is no comparison. Dr. Mayberg is so much more capable, with no agenda, and serving the bottom line to you." Defendant contends that this was impermissible "vouching" by the prosecutor. "A prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn

96

from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record." (*People v. Martinez* (2010) 47 Cal.4th 911, 958.) The prosecutor's remark was reasonable commentary on the credibility of the witnesses and would not have been understood by the jury to vouch for the witnesses' credibility based on the prosecutor's personal beliefs or evidence outside of the record.

Also during closing argument in the guilt trial, the prosecutor remarked: "[T]he defense really comes down to one sentence. I mean, it really does. . . . The defense can be summed up in one sentence. [¶] And it's counsel, when he talked to Dr. Mayberg, and he said Dr. Mayberg, do you believe it's appropriate for the State to execute someone with a brain abnormality? [¶] That's the relevance of it. That's the relevance of it. [¶] Bull. This evidence has no business in this stage of the trial." Subsequently, the prosecutor continued: "And [the defense] brought in Dr. Wu, Dr. Amen, and Dr. Buchsbaum. [¶] I could feel you members of the jury, during initial direct examination by counsel, your pens moving furiously. [¶] I mean, it's like oh, my goodness, what do we have here? I could see it. You were burning up your lines. Just burning it up. [¶] And then all of a sudden, day two of cross-examination came about. And some of you started to go okay, wait a minute. This is a little funky. [¶] Then all of a sudden Dr. Amen comes on. Pens weren't moving so fast anymore. Expecting the long cross-examination. And it came. Stopped taking notes. [¶] When Dr. Buchsbaum came in, about had enough. Because this is bull."

Defendant challenges these statements on two grounds. First, defendant maintains that these statements improperly injected the prosecutor's personal opinions into the trial. Second, he contends that the statements misstate the law. Both claims are forfeited by defense counsel's failure to "make a timely and specific objection to the alleged misconduct and request the jury be admonished to

97

disregard it." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1339.) "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill*, *supra*, 17 Cal.4th at p. 820.) Defendant argues such an objection would have been futile but offers no reason for this conclusion besides a generalized accusation of unfairness in Judge Platt's conduct. However, Judge Platt frequently admonished the prosecutor throughout all phases of the trial. (See *ante*, at p. 86.) Without greater specificity as to why this particular objection would have fallen upon deaf ears, we cannot conclude that it would have been futile for defendant to object to statements made during the guilt phase closing arguments.

Even if not forfeited, the first challenge lacks merit. " 'Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie.' " (*People v. Valencia*, *supra*, 43 Cal.4th at p. 305.) While characterizing the testimony of defense witnesses as "bull" is of dubious persuasive value, it falls within the prosecutor's wide latitude to comment on the evidence during closing argument.

Although it is a narrower question, the prosecutor's remark regarding the relevance of defense counsel's question to Dr. Mayberg, taken in context, does not misstate the law. In the guilt trial, the prosecutor stated that the defense experts' testimony was only relevant to the question of what punishment defendant deserved and he observed that the evidence had "no business in this stage of the trial [i.e., the guilt phase]." The testimony of Drs. Wu, Amen, and Buchsbaum was admitted on the theory that it could undermine elements of the charged crimes related to defendant's state of mind. Accordingly, the evidence was relevant to both phases of trial. Before and after making his remark about relevance, however, the prosecutor did not dismiss the significance of such evidence for

98

defendant's state of mind. Rather, he argued that defendant's alteration of the gun between the shootings revealed his clarity of thought and that defense experts did not present more comprehensive testing because it would reveal that "[t]here's nothing wrong" with defendant. In the context of the prosecutor's direct engagement with this testimony, the challenged remark is best read as arguing that the question of appropriate punishment was not properly before the jury and defense expert testimony was relevant only to defendant's ability to form specific intent.

Whether or not the jury could have misconstrued the prosecutor's remark, any error was harmless. The trial court instructed the jury that the attorneys' closing statements were not evidence and that if anything the attorney said conflicted with the court's instructions, the jury must follow the instructions. Regarding the defense experts' testimony, the trial court instructed the jury as follows: "In several of the crimes charged, there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless the mental state exists, that crime to which it relates is not committed. [¶] . . . [¶] You have received evidence regarding a mental disease, mental defect or mental disorder of the defendant at the time of the commission of the crime charged. [¶] You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated, or harbored malice aforethought, which is an element of the crimes charged in the Information. [¶] You have received evidence regarding a mental defect or disorder of the defendant Louis Peoples at the time of the commission of the crimes charged. [¶] The defense has presented evidence through expert witnesses that Mr. Peoples' brain was abnormal in certain respects. [¶] You should consider this evidence solely for the purpose of determining whether Louis Peoples actually formed any required specific intent, premeditated,

deliberated, or harbored malace [*sic*] aforethought, or formed any other required specific intent described in the instructions pertinent to the special circumstances. [¶] You should consider the evidence of mental defect or mental disorder separately or in combination with any evidence of the defendant's intoxication solely for the purpose of determining whether the defendant Louis Peoples actually formed the required specific intent, premeditated, deliberated or harbored malace [*sic*] aforethought, which is an element of the crimes charged in Count 11, special circumstance attached to Count 11, and the crimes charged in Count 12 or 13, or any lesser crimes pertinent to these counts on which you have been instructed." We presume the jurors followed this instruction (*People v. Smith* (2007) 40 Cal.4th 483, 517), and no evidence suggests otherwise. Accordingly, it is not "reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Defendant next contends that the prosecutor impermissibly presented argument, rather than previewing the facts, in his opening statement in the penalty retrial. In particular, he observes that the prosecutor made the following remarks in his opening statement, each of which prompted an objection that the trial court sustained: "Serial killer. The systematic, repeated, intentional, premeditated and deliberate killing of another person"; "Mr. Peoples has five special circumstances. I want to remind you, clarify something. It's not the aggregate of all five that make Mr. Peoples eligible for the death penalty. Each and every individual special circumstance"; "There's no sign of forced entry. It's a skilled job. Someone knew what they were doing"; "We go first. The defense may or may not put on case. I assume they will. Seen it before. Typical story. Bad life. Bad childhood. Drugs. Poor me. What you're going to hear. Guaranteed."

100

"The function of an opening statement is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality, force, and meaning." (*People v. Dennis* (1998) 17 Cal.4th 468, 518.) Even if the examples listed were improper, none of them "was so aggravated that any potential harm could not have been avoided by an admonition." (*Ibid*.) As the trial court sustained defense counsel's objections and instructed the jury that the prosecutor's opening statement was not evidence, the alleged errors was harmless.

Defendant next challenges the following 10 statements in the prosecutor's closing argument:

(1) "Does he get additional punishment for Stephen Chacko? As a jury, do you look at this as a circumstance to consider in deciding whether or not, my gosh, there's two of them now? [¶] Do we walk out and tell Anice Chacko that her husband's death is a freebie? That it has no value?"

(2) "Serial killer, ladies and gentleman. I mean, serial killer. What is it? Systematic, routine, premeditated, intentional killing of innocent people."

(3) "As you sit here and you think about robberies, you'll see definitions in there of fear. Imagine what Stephen Chacko was thinking when he saw this gun pointed at him. Imagine. Imagine the noise in that store. [¶] You want to talk about mercy for this man, this killer, this systematic, routine killer. Imagine the noise that this gun would create inside a room such as this. And, now, imagine that it's being fired at you. Imagine that for Stephen Chacko."

(4) "He comes back. He sees nobody there, and here comes Jun Gao. He pulls this gun out. [¶] This gun is unloaded. It is safety strapped and checked by these bailiffs. If I pointed the gun at one of you, you would be upset. You would be scared because guns kill. [¶] If I took this gun and pointed it at someone, you would be offended."

(5)   "That's Dr. Kent Rogerson.  He's testified upwards of several hundred times.  He advises the defense routinely.  [¶] Myself and Mr. Fox know . . . .  He knows me."

(6)   "Jim Esten, retired custodial officer, comes in here.  And he is very clear to say I don't represent the Department of Corrections.  He is very clear on that.  He's very clear to say that the Department of Corrections, I do not speak for them, period.  That should stop the conversation, but we'll go on.  [¶] He goes on to say that the Department of Corrections uses the criteria — and I'll look at my notes — the best indicator of behavior is your prior incarceration.  That's what he said.  That's bull."

(7)   "In the last trial he [James Esten] got tore up or got questioned extensively about that.  So what does he tell you this time?  I read your opening statements, so I know the facts a little better.  That was his testimony."

(8)   "Number one, we have no proof of a molest.  God forbid there is a molest.  Absolutely no relevance to this case.  [¶] Dr. Lisak drew absolutely no parallels.  Dr. Lisak absolutely made no diagnosis."

(9)   "I want to start out by saying that is very, very clear Mr. Peoples, the boy, is not on trial.  Mr. Peoples, the man, who made choices is on trial.  [¶] Counsel wants to talk about childhood . . . .  [¶] . . . [¶] Here the man who is on trial is Louis Peoples, the 37 year old."

(10)   "Dr. Woods came in and said Mr. Peoples expresses genuine remorse.  That's the only remorse you hear from, from a defense expert.  Because there's no remorse in those crimes.  There's no remorse when he guns down James Loper and shoots him nine times and then calls Cal Spray for his job back.  [¶] There is no remorse when he guns down Thomas Harrison and laughs about it to Michael Liebelt.  There's no remorse whatsoever about Stephen Chacko when he laughs about it to his wife.  [¶] There is no remorse when he leaves Besun Yu on the floor

to die with two bullets in her back fighting for her life. And he has the audacity to write in the book ha, ha."

The Attorney General argues that defendant has forfeited his challenge to statements (6) through (10) because defense counsel failed to contemporaneously object to these statements or request a curative admonition at trial. Although defendant did not object to these statements during the prosecutor's closing argument, he did move for a mistrial the following day in the proceedings, challenging statements (7) through (10). In *People v. Collins* (2010) 49 Cal.4th 175, 225 (*Collins*), we held a claim of prosecutorial misconduct during cross-examination was preserved despite defense counsel's failure to object at trial, where the next question from the prosecutor triggered an objection and extended colloquy between judge and both counsel in chambers. In *People v. Adams* (2014) 60 Cal.4th 541, 577 (*Adams*), we held that a postverdict motion for a new trial was insufficient to preserve a claim of prosecutorial misconduct for statements made during closing arguments. Defendant's motion here is distinguishable from both prior cases; although there was no immediate discussion among judge and counsel regarding the propriety of the remarks, defendant challenged those remarks before the jury had begun deliberating and well before a verdict had been reached.

The instant facts, in light of the underlying purpose of the forfeiture rule, more closely resemble *Collins* than *Adams*. Our reasons for requiring contemporaneous and specific objection to a prosecutor's alleged misconduct argue in favor of finding defendant's claims preserved here. " 'It is now well settled that an appellate court will not consider a claim as to the misconduct of counsel in argument unless objection is so made.' [Citation.] 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." ' [Citation.]" (*People v. Seumanu*, *supra*, 61 Cal.4th at

103

p. 1341.) Unlike in *Adams*, defendant here raised the issue before defense closing arguments began, thus providing the trial court with an opportunity to admonish the jury prior to the start of deliberations. Moreover, defendant's objections were specific enough for the trial court to craft suitable corrective instructions. Although neither their form nor their timing was ideal, defendant's objections to statements (7) through (10) by way of a motion for a mistrial put the court on notice that misconduct was alleged in time for the court to instruct the jury and correct any error. Accordingly, defendant has forfeited his challenge to statement (6) and preserved his challenges to statements (7) through (10).

Defendant's challenge to statement (2) fails on the merits. The prosecutor's characterization of defendant as a "serial killer" was a fair comment on the evidence and fell within the wide latitude permitted prosecutors during closing argument in the penalty phase of a capital trial. Statements (3) and (4) also were not improper remarks for closing argument. Prosecutors may ask juries to put themselves in the shoes of the victim. (*People v. Jackson* (2009) 45 Cal.4th 662, 691–692.)

Statement (8) was also a reasonable comment on the evidence. As explained *ante*, at pages 44–48, defendant confided in Dr. Gretchen White that on two occasions he had been sexually molested by John Fry, his youth intake counselor when he was a ward of the State of Florida as a teenager. Dr. White also spoke with two other men, Michael Portbury and David Lamson, who claimed to have been sexually molested by John Fry under similar circumstances. During the hearing on a motion to admit the testimony of Portbury and Lamson, the court asked the prosecutor whether he would stipulate that defendant was molested by Fry. The prosecutor declined. The trial court then excluded the testimony of Portbury and Lamson but allowed Dr. White to testify that defendant and two other men had told her they had been molested by Fry. The court also

104

allowed the defense to introduce court documents from Florida showing that Fry had been convicted of procuring a child under the age of 16 for prostitution.

The trial court denied defendant's motion for a mistrial, which was based in part on statement (8). "[W]e review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) The trial court did not abuse its discretion in denying the motion. As noted, the prosecution did not stipulate to the fact that defendant was molested and instead chose not to focus on that aspect of the mitigation evidence during cross-examination of defense witnesses. Given that the only evidence that defendant was molested was the testimony of Dr. White, the prosecutor's lone statement that there was "no proof of molest" seems a reasonable commentary on the weight of the evidence and therefore does not amount to prosecutorial misconduct.

Defendant's challenge to statement (9) — that "Mr. Peoples, the man," and not "Mr. Peoples, the boy," was on trial — is also without merit. As the trial court concluded, "That is accurate. It is argument. It is the man Mr. Peoples who is on trial. [¶] It was not argued that a court or a jury could not consider nor is it improper to consider the impact of the effects of a person's childhood. That was not the reference made." The trial court did not abuse its discretion in denying the motion for mistrial to the extent that it was based on this challenge.

The Attorney General contends that defendant has forfeited his challenge to statement (10) because he failed to contemporaneously object during the prosecutor's closing argument. As noted, defense counsel raised statement (10) as one of the grounds for a mistrial on the day after the prosecutor's closing argument and this is sufficient to preserve the claim. Moreover, with particular regard to this statement, defense counsel raised an objection before the prosecutor's closing

105

argument because the prosecutor had informed counsel that he planned to reference redacted letters to show that defendant was not remorseful for his crimes. Accordingly, the claim is not forfeited. However, defendant's challenge fails.

During closing argument, the prosecutor argued that defendant's conduct during and directly after the crimes demonstrated a lack of remorse. Such comments on the nature of the crime and its commission are proper. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 147 [finding prosecutor's argument on remorse proper where comments "referred to defendant's callous behavior after the killings and occurred during the prosecutor's review of the circumstances and nature of the[] crimes and of defendant's activities after their commission"].) Additionally, the prosecutor's comments on the testimony of Dr. Woods, specifically his opinion regarding defendant's remorse, constituted a permissible evaluation of, and comment on, the evidence. The prosecutor said Dr. Woods's opinion that defendant expressed "genuine remorse" was the "only remorse you hear from, from a defense expert." That statement was true; Dr. Woods's opinion was the only admitted evidence of remorse. Although defendant sought to introduce other evidence of remorse, the trial court made specific findings that the proffered evidence was unreliable. Because the prosecutor's comments regarding a lack of remorse were within the bounds of permissible argument, they do not show the deceptive or reprehensible conduct necessary for a finding of prosecutorial misconduct. Finally, the prosecutor's reference to a redacted letter from defendant to his wife after his arrest as a "love letter" was not misconduct. The prosecutor did not argue that the letter indicated a lack of remorse; instead, the prosecutor juxtaposed defendant's words with photographs of the victims. Such use is not deceptive or reprehensible.

106

As the Attorney General concedes, statements (5) and (7) referred to facts not in evidence and were therefore improper.  Nevertheless, it is not reasonably possible that statements (5) and (7) affected the death verdict.  (*People v. Brown* (1988) 46 Cal.3d 432, 448.)  Both remarks were brief and tangential to the issues in the case, and the trial court correctly sustained defense objections to these statements.

With respect to statement (1), we have previously found no misconduct in the use of the term "freebie" in a multiple murder prosecution where the prosecutor argued that, absent a sentence of death, one of those murders would go unpunished.  (*Adams*, *supra*, 60 Cal.4th at p. 578; *People v. Rogers*, *supra*, 46 Cal.4th at p. 1174 & fn. 23.)  Even assuming the prosecutor's use of "freebie" was improper, it is not reasonably possible, in light of the totality of the penalty phase evidence, that the jury would have returned a different verdict if the prosecutor had not made statement (1).

### 7. *Public conversations with victim's family*

Defendant contends that the prosecutor committed prosecutorial misconduct by engaging in conversations with a victim's family within earshot of Juror No. 7's wife during the penalty retrial.  On April 20, 2000, Michael Quigel testified for the defense in the penalty retrial.  After Quigel's testimony, the prosecutor spoke with the family of victim Besun Yu within earshot of Juror No. 7's wife, who had come to attend the trial.  Defense counsel observed this conversation and moved for a mistrial.  After the jury was excused for the day, the trial court held a hearing to determine the extent of the potential contamination of the jury.

The trial court first interviewed Juror No. 7's wife.  Juror No. 7's wife testified that the prosecutor conversed with the Yu family about "the timeline, I

107

guess, of what would be happening between now and I guess when you are done here." The prosecutor indicated that the trial "would probably end sooner than expected. That the trial would probably go to the jurors sooner than expected." She also testified that Quigel's "name came up, but honestly, I don't — I was trying really hard to just look somewhere else and not [hear]."

At the end of this exchange, the trial court admonished Juror No. 7's wife as follows: "I'm going to instruct you as well that there is to be no mention of what we're talking about now. There is to be no mention of what you overheard in conversation, absolutely not. If it happens, then we will have to start this trial all over again."

The trial court next interviewed Juror No. 7. Juror No. 7 testified that at lunch he and his wife briefly spoke about Quigel. His wife had said: "The man in the jumpsuit was interesting." Juror No. 7 responded: "It surprised me, too." When asked what surprised him, Juror No. 7 responded that a man in custody had taken the stand.

The trial court then interviewed relatives of victim Besun Yu — Karen Tan, Jack Yu, David Yu, Kwei-Yu Chu. Regarding Quigel, David Yu testified that the prosecutor had said defense counsel had changed strategies by calling him, while Kwei-Yu Chu testified that Quigel did not like the prosecutor. The other members of the Yu family did not remember any conversation about Quigel.

Finally, the court interviewed defense investigator Michael Kale. Kale testified that the prosecutor had said that he was angry with Quigel and that Quigel was either "sleazy" or "slimy."

The trial court denied the motion for a mistrial, saying: "The issue is as to any damage or prejudice to the defendant by any of the activity had disseminating to a juror. There was none. . . . [¶] . . . It was not an idle motion. It was absolutely reckless to make any comment related to the case or otherwise about

108

the time of day, the weather, or anything else in the presence of persons whom you do not know the identity of. It absolutely is inexcusable. Absolutely. It is not a small error and it came so close to being sufficient conduct to justify a mistrial had any information been exposed to or disseminated unintentionally to the jury. And it is absolutely inexcusable. [¶] I don't find it intentional. I have observed counsel make far too much contact after court has been concluded with far too many people present. . . . And what is innocuous comment by others is not innocuous comment by either counsel or court staff, including myself. It will not be tolerated in any fashion under any circumstance for the remainder of the trial, and I will sanction significantly if I find my order violated."

After an extensive set of interviews, the trial court found that the prosecutor's behavior was "reckless" but not intentional, and that no prejudice had resulted to defendant because no extraneous information had been shared with Juror No. 7. This finding was not an abuse of discretion. (See *People v. Alvarez*, *supra*, 14 Cal.4th at p. 213.)

### F. Cumulative Error

Defendant claims that the cumulative effect of the court's errors in both the guilt and penalty phases resulted in a fundamentally unfair trial and a miscarriage of justice. We reject this claim because there is no reasonable possibility, considering the record as a whole, that the trial court's few errors in this case prejudiced defendant.

### G. California's Death Penalty Statute

Defendant raises several challenges to California's death penalty scheme that we have repeatedly rejected. We decline to revisit our prior holdings, as follows:

109

Delay in carrying out a death sentence does not by itself constitute cruel and unusual punishment, nor does it prevent fulfillment of legitimate purposes of punishment. (*People v. Salcido* (2008) 44 Cal.4th 93, 166 ["delay, whether in the appointment of counsel on appeal or in processing the appeal, or both, does not inflict cruel or unusual punishment within the meaning of the state or federal Constitution"]; *People v. Young* (2005) 34 Cal.4th 1149, 1230 [a death sentence still serves legitimate penological purposes even after extraordinary delay on appeal].)

Section 190.2 is not impermissibly broad, and section 190.3, factor (a) does not result in arbitrary and capricious death judgments. (*People v. Jackson* (2014) 58 Cal.4th 724, 773 [§ 190.2 is not impermissibly broad and § 190.3, factor (a) does not allow for the arbitrary and capricious imposition of the death penalty]; *People v. Valdez*, *supra*, 55 Cal.4th at p. 179 [in "permitting jurors to consider the 'circumstances of the crime,' section 190.3, factor (a), does not result in the arbitrary and capricious imposition of the death penalty"].)

CALJIC No. 8.88's use of the phrase "so substantial" is not so vague that it will lead to arbitrary and capricious sentencing decisions. (*People v. Lomax* (2010) 49 Cal.4th 530, 595 [the phrase "so substantial" in CALJIC 8.88 is not impermissibly vague].) The use of the adjective "extreme" under section 190.3, factor (d), or as read in CALJIC No. 8.85, in describing mitigating circumstances does not impermissibly hinder the jury's meaningful consideration of mitigating factors. (*People v. Rountree* (2013) 56 Cal.4th 823, 863.) The phrase "whether or not" in section 190.3, factors (d) through (h) and (j) does not unconstitutionally suggest that the absence of a mitigating factor is to be considered as an aggravating circumstance. (*People v. Banks* (2014) 59 Cal.4th 1113, 1207–1208, disapproved on another ground in *People v. Scott*, *supra*, 61 Cal.4th at p. 391, fn. 3; *People v. Cook* (2006) 39 Cal.4th 566, 618 ["CALJIC No. 8.85's use of the

110

phrase 'whether or not,' is not an invitation to jurors who find 'a factor not proven' to then 'use that factor as a factor favoring imposition of the death penalty.' "].)

"The federal Constitution does not require the jury to make written findings unanimously concluding beyond a reasonable doubt that the aggravating factors exist. . . . " (*People v. Merriman* (2014) 60 Cal.4th 1, 106; see *People v. Valdez*, *supra*, 55 Cal.4th at p. 179 [jury's findings regarding the presence of aggravating factors need not be unanimous]; *People v. Mills* (2010) 48 Cal.4th 158, 214 [jury not required to render specific written findings on the aggravating factors].)

We have previously rejected claims that California's death penalty statute violates international norms of decency. (*Adams*, *supra*, 60 Cal.4th at p. 678; *People v. Banks*, *supra*, 59 Cal.4th at p. 1208 [" 'death penalty as applied in this state is not rendered unconstitutional through operation of international laws and treaties' "].) Defendant does not convince us to reconsider this holding.

## CONCLUSION

The judgment is affirmed.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Peoples

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S090602
**Date Filed:** February 4, 2016

_____

**Court:** Superior
**County:** Alameda
**Judge:** Michael E. Platt

_____

**Counsel:**

Phillip H. Cherney, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Glenn R. Pruden and Donna M. Provenzano, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Phillip H. Cherney
214 South Johnson Street
Visalia, CA  93291
(559) 732-6852

Donna M. Provenzano
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1303